JOHN HANCOCK MUTUAL LIFE INSURANCE COMPANY, Appellee, v. C. E. LOOKINGBILL, Administrator, et al., Appellees; DELAWARE GENERAL FINANCIAL CORPORATION et al., Appellants.

No. 42338.

MARCH 13, 1934.

REHEARING DENIED JUNE 23, 1934.

H. H. Gunder, William E. Voor, Fred E. Hansen, and C. A. Smedal, for appellants.

Penningroth & Holmes, Henry & Henry, Lee, Steinberg & Walsh, and H. E. Hadley, for appellees.

MITCHELL, J.—During his lifetime E. B. Clarke was the owner of certain real estate located in Story county, Iowa. He executed a note in the amount·of $16,000 on January 28, 1929, to the Midland Mortgage Company, an Iowa corporation, promising to pay

the principal sum on February 1, 1934, with interest at 5 per cent, payable annually on February 1st of each year, with the usual provision for acceleration of maturity in the event of failure to pay. said interest. His wife, Etta Clarke, also signed the note and mortgage. To secure the payment of the said debt, Clarke and his wife gave a real estate mortgage to the Midland Mortgage Company on the same date. This company was in the business of making real estate loans, and it resold them to various clients, mainly insurance companies. The Midland Mortgage Company forwarded to the John Hancock Mutual Life Insurance Company a copy of the application which was executed by the Clarkes, and an inspector's report describing the farm, to the home office of the insurance company in Boston, Massachusetts. The assistant treasurer of the John Hancock Mutual Life Insurance Company received these papers in Boston, had them duly checked, and recommended the loan for acceptance by the finance committee of the insurance company. The committee approved the loan and the Midland Mortgage Company was so notified. The note, mortgage, and assignment were forwarded by the Midland Mortgage Company to the Atlantic National Bank in Boston, and the John Hancock Mutual Life Insurance Company on March 1, 1929, paid to the bank in Boston for the credit of the Midland Mortgage Company the sum of $16,068.89, being the full amount of the note, plus interest to the date upon which the payment was made by the insurance company. The insurance company then returned the assignment to the county recorder of Story county, Iowa, and the same was duly recorded. In July of the same year the Clarkes sold the farm by warranty deed to the Delaware General Financial Corporation, and the amount of the mortgage, to wit, the sum of $16,000, was figured in as part of the consideration paid by the Delaware corporation to the Clarkes. The Delaware General Financial Corporation paid the interest in 1930 and in 1931, but failed to pay the 1932 interest. The John Hancock Mutual Life Insurance Company commenced this action against the Clarkes and the Delaware General Financial Corporation, praying for judgment on their note of $16,000, plus interest, and for foreclosure of the mortgage. Crim A. Gunder and wife were joined as defendants, being the tenants upon the land against which foreclosure was brought.

The defendant-appellee, E. B. Clarke, and wife, Etta Clarke, filed cross-petition, setting up the fact that because of the dealing

between said defendants-appellees and the Delaware General Financial Corporation their liability was only a secondary liability, and that, before any claim could be made against said E. B. Clarke and Etta Clarke, the security must be exhausted, including the rents and profits. This claim made by these defendants-appellees was first made by way of answer and then the same relief was asked for by way of cross-petition. The Delaware General Financial Corporation, the grantee of the original mortgagors, and the owner of the record title at the time of the foreclosure, filed answer and set up the following defenses: First, a denial on information and belief of the execution of the note and mortgage; second, an alleged oral extension of time for the payment of the interest due February 1, 1932; third, a plea that the John Hancock Mutual Life Insurance Company had no right to foreclose a mortgage in the courts of Iowa because it was a foreign corporation and had not secured or received a permit from the secretary of the state of Iowa to transact business in this state, under the provisions of chapter 386 of the Code of Iowa. By way of counterclaim, the said appellants demanded judgment against the insurance company for the sums of money paid by appellant Delaware General Financial Corporation as interest on the note and mortgage after appellant Delaware General Financial Corporation acquired title to the farm. The tenants, who were also defendants, joined in the answer.

By way of affirmative reply to the third defense, the appellee alleged:

First, that it was a foreign life insurance company and that it had been licensed by the auditor of state in 1914 and by the commissioners of insurance in subsequent years, to transact the business of life insurance in Iowa, and it was therefore not required to comply with the provisions of chapter 386 of the Code, relating to ordinary foreign corporations.

Second, that as a necessary and incidental part of said business of life insurance it had authority to invest its funds in mortgages on Iowa real estate.

Third, that it had no capital stock and for that reason did not come within the provisions of section 8427 of the Code of Iowa of 1931.

Fourth, that the note and mortgage sued upon were not a contract made by it in the state of Iowa, as referred to in section 8427.

Fifth, that the corporation laws of the state of Iowa have been

uniformly construed by the executive officers of the state to require no permit from the secretary of the state to authorize life insurance companies duly licensed by the commissioner of insurance to purchase Iowa mortgages and foreclose the same.

Sixth, that the defendant-appellant corporation received the benefits of the mortgage when it purchased the real estate from the mortgagors and recognized .its validity by the payment of interest thereon and is estopped from questioning its validity.

The case proceeded to trial. Evidence was offered. The lower court found in favor of the appellee and entered a decree, foreclosing the mortgage as prayed for in appellee's petition, and a judgment in rem against the mortgaged premises for the full amount of the mortgage, plus interest and costs, including attorney's fees. The court also denied the relief prayed for in the answer and counterclaim of the Delaware General Financial Corporation. The court also found that E. B. Clarke was only secondarily liable and his wife, Etta Clarke, signed the mortgage and note in suit only as the wife of the defendant-appellee, E. B. Clarke and only for the purpose of releasing her dower interest in and to the premises in question, and that she was not liable on said note.

The appellant Delaware General Financial Corporation, not being satisfied with the finding and decree of the lower court, has appealed to this court.

There are but two questions which are argued in this court by the appellants.

The first, the claim of the appellants that there was an agreement entered into between the appellant Delaware General Financial Corporation and the appellee John Hancock Mutual Life Insurance Company for the extension of time to pay the interest which was due on February 1, 1932. It appears that Mr. Gunder, who was one of the high officials of the Delaware General Financial Corporation, met one of the officials of the insurance company, and he was referred by this official to a Mr. Waples of the Midland Mortgage Company. Mr. Gunder thereafter got in touch with Mr. Waples, and they met at the Pennsylvania Hotel in the city of New York on the 19th of February. There is a marked conflict in the testimony as to just what took place at that time. Gunder claimed that in consideration of an agreement to turn over the rents to the insurance company Mr. Waples told him there would be an extension granted for the period of six months. Mr. Waples claimed Mr.

Gunder talked with him, but that Mr. Waples stated all he could do would be to recommend to the insurance company allowing the matter to run for a period of six months, if the leases were assigned. There was nothing in writing. But, on the very day that Mr. Gunder claimed to have the agreement with Mr. Waples, Mr. Gunder wrote a letter, in which he said:

"I discussed the matter with Mr. Waples today. Taking into consideration that the Delaware General Financial Corporation acquired the equity in the land, subject to the mortgage of $16,000, and that none of the equity owners are obligated to pay the taxes and interest personally, he stated he was willing to recommend that the insurance company allow six months time within which to pay the interest provided the Corporation gave an assignment of the lease," etc.

The record clearly shows that the appellant company has not met the burden of proof to show that there was a valid agreement for the extension of time for the payment of the interest. On this question there was but one witness on each side, but one conversation between these witnesses, and, in addition to this, the admitted letter, written by the witness for the appellant, in which he states that all Mr. Waples agreed to was to recommend to the insurance company an extension of time upon the assignment of certain leases. No leases were ever assigned, nor was an assignment of said leases ever tendered. The learned and able trial court had these two witnesses before him, and we believe was right in holding that the appellant company had failed to prove there was any agreement to extend the period of time for the payment of interest.

We come now to the principal question involved in this case, and that is the contention of the appellant that the John Hancock Mutual Life Insurance Company, the appellee, is a foreign corporation, for pecuniary profit, and that it has not complied with chapter 386 of the Code of Iowa and hence it cannot bring this suit in the courts of Iowa and the note and mortgage are void.

Both sides admit that this question has never been directly passed upon by this court. It is all-important, of course, not alone to the insurance companies who, according to the appellants' brief and argument, have invested in real estate mortgages, numbering more than fifty thousand, an aggregate amount in the huge sum of 412 millions of dollars, but likewise important to the state of

Iowa because of the tax which it would be able to collect if foreign life insurance companies are required to secure a permit from the secretary of state, and also vitally important to the thousands upon thousands of policyholders in this state who, for years, have been paying premiums upon their policies and exceedingly important to the widows and orphans living in Iowa, whose income for the necessities of life depends upon the payment of policies issued by the insurance companies. For, if the appellants' contention is correct, these foreign life insurance companies would lose the amount now invested in real estate and real estate mortgages—the sum above referred to, to wit: 412 millions of dollars.

The following is the history of the legislation covering the proposition that confronts us:

The first statute relating to ordinary foreign corporations and requiring them to obtain a permit from the secretary of state was adopted in 1886, but was declared unconstitutional by the United States Supreme Court in the case of Barron v. Burnside, 121 U. S. 186, 7 S. Ct. 931, 30 L. Ed. 915. In 1897 sections 1637, 1638, and 1639 of the Code of that year were re-enacted, omitting the objectionable sections. In 1909, the 33d General Assembly amended section 1637 by adding after the word "business" in the third line, these words, "as clearly defined and restricted by its articles of incorporation," and by adding a provision requiring the certified copy of the articles when filed to be attested by the secretary of state or other state officer in whose office the original articles were filed. And the 34th General Assembly by chapter 75 of its acts added some specific provisions as to the showing to be made by foreign corporations when making application for permit, and changed the fees required. The amended section appeared as 1637 in the Code Supplement of 1913 as follows, and said sections 1637, 1638, and 1639 as in force in 1913 read as follows:

"Sec. 1637. Foreign corporation—filing articles—process—application—increase of capital—fees. Any corporation for pecuniary profit, other than for carrying on mercantile or manufacturing business as clearly defined and restricted by its articles of incorporation, organized under the laws of another state, or of any territory of the United States, or of any foreign country, which has transacted business in the state of Iowa since the first day of September, eighteen hundred eighty-six, or desires hereafter to transact business in this state, and which has not a permit to do such business,

shall file with the secretary of state a certified copy of its articles of incorporation, duly attested by the secretary of state or other state officer in whose office the original articles were filed, accompanied by a resolution of its board of directors or stockholders authorizing the filing thereof, and also authorizing service of process to be made upon any of its officers or agents in this state engaged in transacting its business, and requesting the issuance to such corporation of a permit to transact business in this state; said application to contain a stipulation that such permit shall be subject to the provisions of this chapter. Said application shall also contain a statement subscribed and sworn to by at least two of the principal officers of the corporation, setting forth the following facts, to wit:

"1. The total authorized capital of the corporation;

"2. The total paid up capital of the corporation;

"3. The total value of all assets of the corporation, including money and property other than money, represented by capital, surplus, undivided profits, bonds, promissory notes, certificates of indebtedness, or other designation, whether carried as money on hand or in bank, real estate or personal property of any description;

"4. The total value of money and all other property the corporation has in use or held as investment in the state of Iowa, at the time the statement is made (if any);

"5. The total value of money and all other property the corporation proposes or expects to make use of in the state of Iowa, during the ensuing year;

"The secretary of state can make such independent and further investigation as to the property within this state owned by any such corporation as he may desire, and upon the true facts determine the value thereof, and fix the fee to be paid by such company. Before a permit is issued authorizing such corporation to transact business in the state of Iowa, said corporation shall pay to the secretary of state a fee of ten cents per one hundred words for recording the certified copy of the articles of incorporation, with resolution and statement as previously set forth, and a filing fee of twenty-five dollars upon ten thousand dollars or less of money and property of such company actually within the state of Iowa, and of one dollar for each one thousand dollars of such money or property within this state in excess of ten thousand dollars. If from time to time the amount of money or other property in use in the state of Iowa by said foreign corporation is increased, said corporation shall at

the time of said increase, or at the time of making annual report to the secretary of state, in July of each year, file with the secretary of state a sworn statement showing the amount of such increase, and shall pay a filing fee thereon of one dollar for each one thousand dollars or fraction thereof of such increase, together with a recording fee of ten cents per one hundred words, but not less than fifty cents. The secretary of state shall upon request furnish a blank upon which to make report of such increase of capital in use within the state. Any corporation transacting business in this state prior to the first day of September, eighteen hundred eighty-six, shall be exempt from the payment of the fees required under the provisions of this section. The secretary of state shall thereupon issue to such corporation a permit, in such form as he may prescribe, for the transaction of the business of such corporation, and upon the receipt of such permit said corporation shall be permitted and authorized to conduct and carry on its business in this state. Nothing in this section shall be construed to prevent any foreign corporation from buying, selling and otherwise dealing in notes, bonds, mortgages and other securities.

"Sec. 1638. Permit. No foreign corporation which has not in good faith complied with the provisions of this chapter and taken out a permit shall possess the right to exercise the power of eminent domain, or exercise any of the rights and privileges conferred upon corporations, until it has so complied herewith and taken out such permit.

"Sec. 1639. Penalty. Any foreign corporation that shall carry on its business in violation of the provisions of this chapter in the state of Iowa, by its officers, agents or otherwise, without having complied with this statute and taken out and having a valid permit, shall forfeit and pay to the state, for each and every day in which such business is transacted and carried on, the sum of one hundred dollars, to be recovered by suit in any court having jurisdiction; and any agent, officer or employee who shall knowingly act or transact such business for such corporation, when it has no valid permit as provided herein, shall be guilty of a misdemeanor, and for such offense shall be fined not to exceed one hundred dollars, or be imprisoned in the county jail not to exceed thirty days, or by both such fine and imprisonment, and pay all costs of prosecution. Nothing contained in this chapter shall relieve any person, company, corporation, association or partnership from the perform-

ance of any duty or obligation now enjoined upon or required of it, or from the payment of any penalty or liability created by the statutes heretofore in force, and all foreign corporations, and the officers and agents thereof, doing business in this state shall be subject to all the liabilities, restrictions and duties that are or may be imposed upon corporations of like character organized under the general laws of this state, and shall have no other or greater powers."

These were the statutes relating to ordinary foreign corporations which were in force in 1914, when the John Hancock Mutual Life Insurance Company first began to do business in Iowa.

The 39th General Assembly in 1921, by chapter 139 of its acts, again amended section 1637 by striking out the exception in the first sentence relating to mercantile and manufacturing business and by striking out the exception in the last sentence, reading as follows:

"Nothing in this section shall be construed to prevent any foreign corporation from buying, selling and otherwise dealing in notes, bonds, mortgages and other securities."

It added a further provision, which is now paragraph 6 of section 8421 of the 1931 Code, requiring the corporation to furnish a certified copy of the resolution of the board of directors, naming a process agent, and added the following additional sentence to section 1637, which is now section 8427:

"No foreign stock corporation doing business in this state shall maintain any action in this state upon any contract made by it in this state unless prior to the making of such contract it shall have procured such permit. This prohibition shall also apply to any assignee of such foreign stock corporation and to any person claiming under such assignee of such foreign corporation or under either of them."

When the 1924 Code was adopted, section 1637, as amended, and sections 1638 and 1639 became chapter 386 of said Code, and so appear in the Codes of 1927 and 1931. Section 1637 was divided up into seven sections, and these are numbered sections 8420 to 8426. The additional provision about the commencement of suits which is quoted above, and which was section 4 of chapter 139 of the Acts of the 39th General Assembly, appears as section 8427 of

the present Code. Section 1639 of the Code of 1897 was never amended, but in the Code of 1924 was split up into three sections, and they appear as sections 8430, 8431, and 8432.

It will be noted from the above history that the original act of the 1897 Code, section 1638, provided that no foreign corporation which did not obtain a permit could exercise any of the rights and privileges conferred upon corporations. This was made more specific and at the same time modified by section 4, chapter 139, of the Acts of the 39th General Assembly, adopted in 1921, which provided that no foreign stock corporation doing business in this state shall maintain any action in this state upon any contract made by it in this state unless it has procured a permit.

It is admitted in this case, by the appellee company, that it has not complied with chapter 386, and it is the claim of the appellant that because the appellee has not complied with the statutes embodied in chapter 386, because it has not filed its articles with the secretary of state, nor applied for permit as required by section 8420; has not paid the fees required in sections 8423 and 8424; has not received the permit required by section 8426; and that by reason of its noncompliance with the statutes, appellee cannot maintain this suit, and that the note and mortgage are void. The appellee claims that it has complied with the statutes relating to foreign life insurance companies, and that the legislature never intended section 8420 of chapter 386 to apply to foreign life insurance companies which had obtained a permit to do business in the state under the statutes relating to life insurance companies. These statutes are sections 8652 to 8659 of the Code of 1931, and they have been in force since 1873. It will be noted that these statutes were adopted long before section 1637 of the Code of 1897, referring to ordinary foreign corporations, was adopted.

Section 8657 is as follows:

"8657. Annual certificate of authority. On receipt of such deposit and statement, and the statement and evidence of investment of foreign companies, all of which shall be renewed annually, by the first day of March, the commissioner of insurance shall issue a certificate setting forth the corporate name of the company, its home office, that it has fully complied with the laws of the state and is authorized to transact the business of life insurance for the ensuing year, which certificate shall expire on the first day of April of the ensuing year, or sooner upon thirty days' notice given by the

commissioner, of the next annual valuation of its policies. Such certificate shall be renewed annually, upon the renewal of the deposit and statement by a domestic company, or of the statement and evidence of investment by a foreign company, and compliance with the conditions above required, and be subject to revocation as the original certificate."

This statute originally provided for the issuance of the annual certificate by the auditor of state, but when the insurance department was created the certificates were issued by the commissioner of insurance.

This record shows that the John Hancock Mutual Life Insurance Company first applied to do business in Iowa in 1914, long before the office of insurance commissioner had been created, and under the provisions of the law at that time the auditor of the state duly issued a certificate to the appellee company, which certificate was introduced as an exhibit and set out in the record, and it recites that the company has fully complied with the laws of Iowa relating to life insurance companies and is authorized to transact its appropriate business of life insurance in this state in accordance with its laws. Annually thereafter, in compliance with the law, a certificate was duly issued by the auditor of the state, and then by the insurance commissioner to this appellee company, authorizing it to do business in this state. It is true, of course, that there is no express exception of life insurance companies in chapter 386, but section 8420 of said chapter contains what amounts to a broader exception, limiting its application to any corporation "which has not a permit to do such business." Such exception does not refer to a permit under chapter 386 to be issued by the secretary of state, but a "permit", and it is the claim of the appellee here that, having secured a permit from the proper state officer, to wit, the auditor of state, and then the insurance commissioner, it was not necessary, nor was it the intent of the legislature to require a foreign life insurance company to secure a second permit from the secretary of state, for, by securing a permit from the insurance commissioner it had complied with the laws of Iowa covering foreign life insurance companies, and it had a right to do business in the state of Iowa.

In the case of St. Louis, I. M. & S. R. Co. v. Commercial Union Ins. Co., 139 U. S. 223, 11 S. Ct. 554, 556, 35 L. Ed. 154, the Supreme Court of the United States considered the statute of Arkan-

sas applying to ordinary foreign corporations requiring said corporations to file with the secretary of state a designation of a process agent and place of business in the state, and providing:

"If any such foreign corporation shall fail to comply with the provisions of the foregoing section, all its contracts with citizens of this state shall be void as to the corporation, and no court of this state shall enforce the same in favor of the corporation."

The court went on to consider the statutes of Arkansas relating to foreign insurance companies. These statutes are very similar to the statutes of Iowa, and required filing of a showing of condition with the auditor of state, designation of the auditor as process agent, the issuance of a certificate of authority by the auditor entitling the company to do business in the state, and a penalty for doing business without such certificate of authority. The court held that a comparison of the statutes relating to ordinary foreign corporations first referred to above with the other legislation of the state relating to foreign insurance companies clearly showed that the act relating to foreign corporations was not intended to include foreign insurance companies. The court said, after setting forth the insurance statutes:

"It thus appears that the state of Arkansas had established and maintained a distinct system with regard to foreign insurance companies, under the superintendence of the state auditor, by which every such company was required to file with the auditor a stipulation for the service of process upon it, as well as to make full returns of its condition and business to that officer, to report to him the names of all its agents within the state, and to receive from him certificates of authority for itself and for each of its agents; evidently contemplating that a foreign insurance company would have no principal place of business within the state, but would transact its business in the usual manner through agents at different places.

"Such being the settled policy of the state with regard to foreign insurance companies, they cannot reasonably be held to be governed by the act concerning foreign corporations generally, which required a certificate to be filed with the secretary of state, designating an agent upon whom service might be made, and stating the principal place of business of the corporation within the state. To construe that act as including foreign insurance companies would require the drawing of one of two equally improbable inferences,—

either that the only stipulations of such companies for service of process upon them should be filed in a different public office from that in which all other returns and documents relating to such corporations are preserved, or else that their stipulations for such service must be filed both with the auditor and with the secretary of state.

"For these reasons we are satisfied that the omission of the plaintiffs to file in the office of the secretary of state the certificates required by the statute of Arkansas of April 4, 1887, chap. 135, was no bar to this action."

And so, under our statute, if it be that a foreign insurance company must also comply with chapter 386, then it must designate two officers upon whom service can be made, which certainly would seem to be an unnecessary thing to do as there is already one person upon whom service may be made in this state, under the law of this state.

In the case of State ex. rel. Kahn v. Tazwell, 125 Or. 528, 266 P. 238, 59 A. L. R. 1436, the Supreme Court of Oregon has also pointed out the distinction between the statutes relating to foreign life insurance companies and the statutes relating to all ordinary foreign corporations. In that case the New York Life Insurance Company had been admitted to do business in the state of Oregon as a foreign life insurance company, but it claimed that the court had no jurisdiction of a suit brought by a resident of Germany on a contract made with the company in Germany. The court held that the Oregon courts had jurisdiction of the case. The opinion cites the provisions of the Oregon statutes, which are similar to those of Iowa, in providing for the appointment of an insurance commissioner and prescribing the conditions which a foreign insurance company must comply with in order to be entitled to do business in the state. The court said: (page 241)

"When the New York Life Insurance Company complied with this section, it consented to all terms thereof, and assumed the duties and liabilities thereby imposed, as well as accepting the privileges and benefits thereof. * * * Such company, upon complying with the state law, has the right to institute and prosecute any action or suit against any person in any of the courts of this state, whether the cause of action or suit is based upon a contract made in the state or elsewhere.

"Oregon Laws, section 6908, contains a like provision for the

appointment of an attorney in fact by other foreign corporations before doing business in this state, and authorizing service of process in the same manner and with like effect as the act in question.

"A similar statute in this state dates from 1864. * * * The Insurance Act in question, and prior laws of similar effect, which have been in force since 1887 * * * which apply to foreign insurance companies, as to them take the place of the statute governing other foreign corporations."

There can be no question that the state of Iowa had a right to prescribe the conditions which must be performed by a foreign life insurance company before it can do business in this state. This right has been recognized by the Supreme Court of the United States too often to be open to argument. Some states have gone further than others, and the decisions of the various courts have to be carefully considered in .the light of the particular statutes involved. Iowa has prescribed the requirements that foreign life insurance companies must comply with before they will be permitted to do business within this state. And, if these requirements do not meet with the approval of the people of this state, the legislature has the right to change those requirements. That is a matter for the legislature, and not for the courts.

Courts have always given great weight to the construction of statutes of this kind by the executive department of the state, whose duty it is to enforce them. This record shows, without any dispute, by the testimony of the deputy secretary of state in charge of the corporation department, that no secretary of state has ever demanded the appellee to obtain a permit from him, and no executive officer in the state of Iowa has ever attempted to collect any penalty for failure to obtain such permit. He even went further than this and testified that the secretary of state's office interpreted the corporation laws of Iowa as requiring no permit from the secretary of the state to be issued to a foreign life insurance company, licensed by the insurance commissioner, before purchasing Iowa mortgages, foreclosing them, and operating the foreclosed real estate. It is the duty, under the law of this state, for the executive officers of this state, if any foreign corporation fails to comply with chapter 386, to see that the officers of said corporation are duly punished, as they are guilty of a misdemeanor, and that a penalty of $100 per day is to be paid to the state. And yet, in this case, the record shows that none of the officers charged with that duty have

ever made any effort to inflict the penalties provided for in these statutes on any foreign life insurance company that has secured a permit from the insurance commissioner, and for the reason that, in their judgment, foreign life insurance companies that have a permit from the insurance commissioner, do not come under chapter 386. The reason that this construction is so important is because it shows the intent of the legislature. The legislature is presumed to know the construction of its statutes by the executive departments of the state, and if the legislature of this state was dissatisfied with the construction which has been placed upon them by the duly elected officials in the past years, the legislature could very easily remedy this situation, as it has the power to pass such legislation,' and the only conclusion we can come to is that the legislature must have been satisfied with the construction placed upon the act by the secretary of state.

This court in the case of Bankers Mut. Casualty Company v. National Bank, in 131 Iowa 456, on page 466, 108 N. W. 1046, said:

"It thus appears that the officers, to whom was especially committed the duty of enforcing the statute, interpreted it as permitting burglary insurance, and by their approval gave the company at least apparent authority to transact such business. So far as we know that interpretation and authority remained unchallenged for a period of 10 years and until the objection was raised by the demurrer in this action. The appellee has held the policy issued to it by the appellant for the full period of insurance, and has from time to time paid the accruing assessment without objection or protest so far as the pleadings disclose until the final call on which this suit is based. While not disclosed by the record, it is at least probable that much other business of this kind has been transacted by this and other companies doing a like business on the strength of this interpretation of the law by the state officers to whom its administration was committed; and much less injustice is likely to be accomplished by adhering to that interpretation than by departing therefrom at this late date."

Again, in the case of Farmers Telephone Company v. Washta, 157 Iowa 447, 133 N. W. 361, the question involved the statutes relating to the use of the streets of the city by the telephone system. The court said on page 458:

"We think, too, that some weight should be allowed to the practical construction which has been placed upon the statute.

"It is a matter of common observation that public utility corporations have quite universally accorded to the statute the effect which we here give to it; since it became the law of the state, they have sought and obtained entrance into the cities and towns of the state only by the method and under the restrictions imposed by Code, sections 775 and 776. Such was the intervener's own conception of its rights when it sent its agents to Washta to secure the passage of ordinance No. 33. The view thus indicated we hold to be the correct one. The opposite conclusion would come as a surprise, not only to the profession and to the cities and towns of the state, but to the promoters and proprietors of telephone enterprises themselves, and result in an unfortunate increase of confusion and disharmony."

In the case of New York Life Ins. Co. v. Burbank, 209 Iowa 199, 216 N. W. 742, involving the construction of the statutes taxing foreign life insurance companies, the court found that the statutes had been interpreted in a certain way for many years, and held that the executive construction should be given much weight, saying on page 206:

"It is a fair presumption that the legislature, by the re-enactment without change of language, was satisfied with such construction, and intended that it should continue."

In the case of Arnreich v. State, 150 Md. 91, 132 A. 430, the question involved was the interpretation of a license statute. The appellant had been doing business for many years, and no effort had been made by the state to collect a license from it or others in similar business. The court said: (page 435)

"At any rate, the long, unvarying, and uninterrupted contemporaneous construction put upon this section of the Code by the administrative officers must at this time be given the force of law. It must be presumed that the legislature during all these years knew that the people engaged in this business were not being required by the administrative officers to secure a traders' license, and that this was the administrative interpretation put upon the section, and, therefore, by acquiescence, the legislature had approved this administrative construction; for, if they had not, it would have been a simple matter to specifically include stall owners in the markets of Baltimore City among those required to obtain this license."

In the Nebraska case of Kennedy v. Royal Highlanders, 109 Neb. 24, 189 N. W. 612, the court had before it the question of whether a mutual benefit association could write endowments under the Nebraska statute. Said statute had been construed by the state officials and the society to give such power, and this construction was upheld. The court said on page 616:

"The contemporaneous construction placed upon a statute by those charged with its execution, where such construction has long prevailed and been recognized by the parties who are concerned and who are ruled by the statute, will not be disregarded, unless it is clear that such construction was erroneous. The statute is not so clear that it is free from doubt as to what the legislature intended, and we find no cogent reason for disturbing contractual obligations which have grown up based upon that construction, and which have existed and been recognized by the society for so many years."

There can be no question in this record about the facts in regard to executive construction. The state of Iowa through the state auditor licensed the John Hancock Mutual Life Insurance Company in 1914, and the state has collected premium taxes from it for twenty years. During that period of time the John Hancock Mutual Life Insurance Company has been doing business in this state, selling life insurance and loaning money upon real estate, until now we find that this one company alone has thirty-seven millions of dollars loaned upon good Iowa land, and it has, through the process of foreclosure, through the failure of the people who borrowed this money to carry out the contracts entered into, acquired real estate of the value of $1,800,000. The state knew that the appellee company was doing business in this state and that its only authority to do business was its certificate from the auditor and later from the commissioner of insurance. Yet, never during these twenty years did any one of the various secretaries of state ask or require that a permit be secured from the secretary of state, nor did any officer of this state ever exact any penalty for failure to obtain such permit. Never has this question been raised by any public official or by any citizen of this state until the Delaware General Financial Corporation, a foreign corporation, raised it. And then it was only raised when this foreign corporation had defaulted in the requirements of a contract it had entered into with the appellee company. Covering some twenty-five or thirty pages in the brief and argu-

ment submitted by the appellant is an attack upon the manner and method in which the insurance companies in general and the appellee company in particular do business. They state today that excessive salaries have been paid to various officials of said insurance companies. No doubt there have been things done by the various insurance companies which should not have been done. No doubt, in the light of the present existing conditions, the salaries paid are excessive, but there is no showing in this record of any fraud on the part of the appellee company in this case. The money was loaned. The mortgage was taken as security. There was default in the terms of the mortgage. The Delaware General Financial Corporation set up this defense. They say that the construction placed upon these statutes by the duly elected officials of this state is wrong. And thus it remains for a corporation from the state of Delaware to come out to Iowa to inform the officials of this state that for twenty years they have failed to do their duty. .

In view of the cases cited, in view of the construction placed upon these statutes by the executive officers of this state for a period of some twenty years, we find ourselves unable to agree with the theory of the appellant corporation. The insurance company in this case having complied with the requirements of the statutes covering the securing of a permit from the insurance commissioner, having paid to the insurance commissioner the fees therein demanded, to wit: 2½ per cent of the premiums collected by said insurance company, having designated a process agent, and having been issued a permit to do business in the state of Iowa by the insurance commissioner, had a right to do business, and it was not necessary that they secure a permit from the secretary of state.

Judgment and decree of the lower court must be and it is hereby affirmed.

CLAUSSEN, C. J., and STEVENS, EVANS, DONEGAN, KINDIG, ANDERSON, KINTZINGER, and ALBERT, JJ., concur.