**METROPOLITAN LIFE INS. CO. v. WHITE-STONE MANAGEMENT CO. et al.**

**DRAKE et al. v. METROPOLITAN LIFE INS. CO. et al. (two cases).**

**WALKER v. WHITESTONE MANAGEMENT CO. et al.**

**Nos. 5288, 5289.**

Circuit Court of Appeals, Seventh Circuit.
April 17, 1935.

Rehearing Denied June 19, 1935.

Charles C. LeForgee, of Decatur, Ill., and Edwin W. Sims, Franklin J. Stransky, Walter Brewer, and Paul M. Mitchell, all of Chicago, Ill., for appellants.

Thomas M. Hoyne, Nathaniel Rubinkam, George Gillette, Norbert B. Tyrrell, E. W. Everett, and William C. MacLean, all of Chicago, Ill., for appellees.

Before ALSCHULER, SPARKS, and FITZHENRY, Circuit Judges.

SPARKS, Circuit Judge.

The issues in these cases are identical. In cause No. 5288, the Metropolitan Life Insurance Company of New York filed a bill to foreclose its deed of trust executed March 3, 1926, by the Whitestone Company, then the owner in fee of the Drake Hotel in Chicago, to secure a $4,000,000 loan made by the Metropolitan. The bill was filed on April 4, 1933, upon default in certain principal and interest payments due under the note. The defendants to the bill were the Whitestone Company; its successor, the Whitestone Management Company; the Chicago Title and Trust Company (trustee under the trust deed); the National Realty and Investment Company (holder of a junior mortgage on the premises); and a group of subtenants occupying quarters on the premises. Included in this latter group were Tracy C. Drake, his wife and daughter, and John B. Drake and his wife and two daughters whose interest in the premises was said to arise out of an agreement, dated July 15, 1932, and duly filed for record, between the Whitestone Management Company, party of the first part, and Tracy C. Drake and John B. Drake, parties of the second part. The bill prayed for an accounting, for a foreclosure and for a receiver.

On the day the bill to foreclose was filed, W. M. Walker, appellee in No. 5289, filed a creditors' bill against the Whitestone Management Company, in which he asked for the appointment of a receiver. Thereupon, the court appointed appellee Williamson receiver in both causes, whereupon with the approval of the court, he notified the Drakes that he elected to disaffirm the contract between them and the Whitestone Management Company on the ground that the contract was detrimental to the interests of the estate.

In cause No. 5288, the two Whitestone Companies and the Drakes filed an answer to the bill neither denying nor affirming the allegations and demanding proof. The Drakes were permitted to intervene in cause No. 5289, and filed an answer in the nature of a cross bill to the bill of complaint in each cause. It was claimed in those answers and is now contended: (1) That the loan of March 3, 1926, and the mortgage securing it were invalid by reason of the Metropolitan's failure to obtain a license as a foreign corporation to transact business in Illinois; (2) that the Metropolitan was estopped to deny that the lien, leasehold and annuity interests of the Drakes, by virtue of their operating contracts of March 18, 1919 (hereinafter referred to) and on July 15, 1932, were prior and superior to the 1926 mortgage lien; (3) that the Metropolitan had come into equity with unclean hands, and that it must do equity to the Drakes before it could be permitted to have the relief sought; (4) that the receiver had no power to disaffirm the Drakes' operating contract of July 15, 1932. Both causes were referred to a master to hear the evidence and to report his findings of fact and his conclusions of law thereon. That report was adverse to each contention now urged by appellants, as set forth above. Exceptions to the master's findings and conclusions were filed by the Drakes. They were overruled by the court and the master's report was confirmed. The Drakes' cross bill and intervening petition were dismissed for lack of equity and the court retained jurisdiction until final decrees on the complaints.

The facts as found by the master, and which are supported by substantial evidence, are as follows:

In 1919 the Whitestone Company was organized for the purpose of building the Drake Hotel in Chicago. With a $5,000,000 first mortgage loan from Straus & Company the site was procured and the buildings were erected which are now in foreclosure. Tracy C. and John B. Drake were officers, directors and stockholders of the Whitestone Company, as well as of the Drake Hotel Company which managed another local hotel, the Blackstone.

On March 18, 1919, a management contract was entered into between the Whitestone Company and the Drake Hotel Company for a term of twenty-five years. This vested exclusive management of the new hotel in the Drake Hotel Company, provided for compensation to the managing company in the amount of $30,000 annually and a percentage of the profits, together with board and lodging accommodations to the active managers and employees of the operating company without expense to them, to such extent as had been usual in the Blackstone. John B. Drake moved to the new hotel and Tracy Drake remained at the Blackstone. In 1922 the Drakes caused the Drake Hotel Company to adopt a resolution which purported, without consideration, to assign the operating contract to themselves as individuals and to extend the benefits of that contract to their sons and grandsons.

In 1926 it became necessary to refinance the mortgage on the Drake Hotel property

by obtaining a smaller loan for a longer period. Tracy Drake conducted these negotiations and, as a result, a $4,000,000 first mortgage loan was obtained from the Metropolitan Life Insurance Company. In obtaining this loan Tracy Drake and his principal, the Whitestone Company, represented the title to the premises to be free and clear of any lien or encumbrance except that of the Straus mortgage, and at no time during the negotiations was any claim made by the Drakes, or the Drake Hotel Company, or the Whitestone Company that the contract of 1919 created a lien or charge upon the mortgaged property.

On February 23, 1927, the Drake Hotel Company (by Tracy Drake, its president, and A. B. Mapes, its assistant secretary) agreed with the Whitestone Company (by the same Drake and Mapes) to extend the operating contract of 1919 for a period of fifty years.

In the latter part of 1931 the Whitestone Company was delinquent in the payment of its principal and interest to the Metropolitan in the approximate amount of $270,000; it was delinquent in the payment of its taxes for 1929 and 1930 in excess of $300,000; and it lacked sufficient working capital to continue operations. Negotiations were had looking to a reorganization by the Drakes, Benjamin H. Marshall and other interested parties. Marshall was a stockholder of the Whitestone Company, and was also president and a director of the National Realty and Investment Company. The latter company offered to provide additional working capital under a plan of reorganization, provided the mortgagee waived existing defaults, and the Drakes canceled the contract of 1919. The plan finally agreed upon provided (1) the formation of the Whitestone Management Company to take over the assets and certain liabilities of the old company in return for part of its capital stock, (2) the purchase by the National Realty and Investment Company, for cash, of $100,000 par value of the reorganized company's capital stock, (3) the advancement by the same company of additional funds for working capital, to be secured by mortgage subordinate to the Metropolitan mortgage, (4)

the cancelation of the operating contract of 1919 and the release of all rights thereunder by the Drakes. The plan was conditioned upon the willingness of the Metropolitan Company to cure the mortgage defaults by extending certain serial principal prepayments to the final maturity of the mortgage, and to lend sufficient money to the new company to pay the delinquent taxes. This plan was approved by the board of directors and the stockholders of the Whitestone Company. The Drakes attended each meeting and voted in favor of the plan which was consummated on July 15, 1932. Thereupon, the Drakes gave to the Whitestone Company and to the Whitestone Management Company a release of all claims and a covenant not to sue either of the companies; the Drake Hotel Company expressly canceled the 1919 contract and all amendments and assignments thereof, and released both Whitestone companies thereunder; and the Drakes and the Drake Hotel Company jointly and severally released and quitclaimed to the Whitestone Management Company all their right, title and interest in the property. The Whitestone Management Company thereupon paid the Drakes $50,000 in cash, gave them its promissory note for $50,000, and issued to them certain stock in the new company. The new company also canceled all indebtedness due the Whitestone Company from the Drakes and the Drake Hotel Company. At the same time the Metropolitan extended the payment of the principal then due on its mortgage and advanced $300,000 for the payment of the delinquent taxes. This advancement was secured by a mortgage on all furniture, fixtures and real estate of the new company. The National Realty and Investment Company purchased 20,000 shares of the Class B stock of the new company for $100,000 in cash and loaned $35,000 to that company for which it received the new company's note secured by a mortgage, subordinate to the Metropolitan's two mortgages.

On the same day, and in consummation of the plan agreed upon, the contract upon which the Drakes base their claim of a lien was entered into between them and the new company. The pertinent provisions are set forth in the margin.[1] It was referred to as

---

[1] "Whereas, said Tracy C. Drake and John B. Drake and the New Company mutually desire to enter into an Employment Contract in relation to the services and employment of said (Drakes), * * *

"Now, Therefore, for and in consideration of the covenants hereinafter set forth * * * and the payment of * * * $50,000 upon the * * * delivery of this instrument and the giving of one or more promissory notes by the New Com-

an employment contract by the parties themselves in the releases which they concurrently executed and delivered, and the contract recited that all parties thereto mutually desired to enter into an employment contract in relation to the services and employment

pany for the aggregate principal sum of * * * $50,000, payable to Tracy C. Drake and John B. Drake, if at all, over a period of three * * * years solely from * * * 25% of the net operating income of the New Company, together with other good and valuable considerations * * * it is mutually covenanted and agreed by and between the parties hereto as follows:

"1. The New Company does hereby employ * * * said Tracy C. Drake and said John B. Drake to serve in an advisory and administrative capacity in the operation of the hotel business of the Company * * * for a period of * * * 6½ years. * * * Said Drakes * * * shall do and perform said above described duties as may be assigned to them from time to time by (and shall at all times in the performance of such duties be subject to the supervision and direction of) the Board of Directors of the New Company, or its successors in the title to said hotel building and property, provided, always, however, that the Drakes shall not at any time be assigned merely clerical duties. * * *

"3. The New Company does hereby rent, lease and demise to the said John B. Drake that certain space and apartment (including the drapery hangings, furniture and furnishings therein contained which may be owned by the New Company). Said demised premises being described and known as Apartment or Suite 950 * * * of the building now known as the Drake Hotel. * * *

"4. In the event said Tracy C. Drake for any reason, during said term * * * 6½ years from the date hereof, because of a change in the management of that certain other hotel known as The Blackstone Hotel * * * yields occupancy or is dispossessed of the apartment and space occupied by him and his family, as now constituted, as their place of abode in said Blackstone Hotel, the New Company will demise and lease to said Tracy C. Drake, and furnish with suitable furniture and draperies, an apartment of a size substantially equal to that thus leased to said John B. Drake for and during the remainder of said term of * * * 6½ years from the date hereof, without charge or expense to him therefor.

"5. The New Company will for and during * * * period of * * * 6½ years pay to said Tracy C. Drake the sum of * * * $15,000 per annum and to said John B. Drake the sum of * * * $15,000 per annum. * * *

"6. The New Company shall also during the term of this agreement furnish in said hotel, without charge, to said Tracy C. Drake and to said John B. Drake and to the members of their respective families as and when during said period of time they desire to receive the same, food, hotel service, and family laundry service, as well as such other service as is customarily from time to time furnished by said hotel to its guests and for the furnishing of which it is or shall hereafter be equipped and also the right from time to time to said Tracy C. Drake and said John B. Drake of entertaining a reasonable number of guests, subject to the approval * * * of the Board of Directors of the New Company.

"7. With respect to each of said parties of the second part, if at any time during the * * * 6½ years period * * * at the election of said New Company and not because of his own failure in good faith and with reasonable efficiency to perform the service herein agreed by him to be performed, his employment hereunder by New Company shall be discontinued, such discontinuance shall not release or in any manner effect the rights of such individual and his said family to the occupancy and the right of occupancy for the then remaining portion of said * * * 6½ year period of the space to him hereinbefore demised * * * or provided so to be, and to the service * * * agreed by the New Company to be to him and his said family given * * * nor operate in any manner as a release of the obligations of the New Company to continue to pay * * * $15,000 each year. * * *

"8. With respect to each of said parties of the second part, in the event of his death before the expiration of * * * 6½ years from the date hereof, said sum of $15,000 per year which, if such deceased person had continued to survive would, under the terms hereof have been payable to such deceased person, during the remainder of such * * * 6½ year period shall be paid to the estate or personal representatives of the deceased * * * and in such case also during the then remaining portion of said * * * period * * * the right to the use and occupancy of said space and apartment hereinabove mentioned as demised * * * or provided so to be, and to the Hotel service * * * shall be extended and accorded to the surviving wife and those from time to time surviving of the members of the family of such deceased person who are now living with him."

of the Drakes. It further recited that the new company employed the Drakes to serve in an advisory and administrative capacity in the operation of the hotel for a period of six and one-half years, the Drakes to perform such duties, except mere clerical duties, as might be assigned to them by the board of directors. In consideration of the performance of those services and the other covenants of the Drakes, the new company agreed to pay each of them $15,000 annually for six and one-half years; to rent, lease and demise an apartment in the hotel to John B. Drake for that period, and to do the same for Tracy C. Drake, in case he became dispossessed of the apartment then occupied by him in the Blackstone Hotel; and the company further agreed to furnish them, in connection with the apartments, food, laundry, and such other hotel services as were customarily furnished to the hotel guests.

In April, 1933, the funds of the new company had been depleted to the extent that it had only $27,000 in cash with only $8,000 available for operating the hotel, and acting under its chattel mortgage the Metropolitan placed a custodian in possession of the personal property in the hotel.

On May 2, 1933, the receiver, having decided that the employment contract of July 15, 1932, was detrimental to the best interests of the estate, and having elected to disaffirm and disavow that contract, served notice to that effect on Tracy C. and John B. Drake and the members of their families, and requested them either to vacate the apartments occupied by them and to discontinue receiving restaurant, laundry and other services, or to pay therefor at the rates customarily paid by other guests of the hotel.

When the receiver was appointed, the Whitestone Management Company had on hand only $2,800 in cash, which was inadequate to operate the hotel. The receiver, as of April 15, 1933, made an agreement with the Metropolitan and one Brashears, formerly an assistant manager, to manage and operate the hotel, at $20 per room per year, payable only if the money were earned by the hotel, without personal obligation of the receiver. This operating agreement was approved by the court on May 10, 1933. Under this agreement the Metropolitan advanced to Brashears as such manager $50,000 as working capital. This was to be repaid out of the income of the hotel and the remainder of such income, if any, was to be turned over to the receiver. Brashears was permitted by the Metropolitan to use the furnishings, furniture and equipment then in its possession under its chattel mortgage. This advancement was made by the Metropolitan conditionally upon the employment of Brashears as manager. The master found that the approximate annual expense under the Drake contract was $72,000, and that the maximum amount due Brashears under his contract was $14,000, based on 700 rentable rooms.

It was stipulated between the parties that the Whitestone Management Company was adjudicated a bankrupt on May 23, 1933, and that a trustee was appointed who subsequently sold all the bankrupt's assets, subject to existing liens. The fee simple title to the premises and the furniture and equipment, and the good-will, including the right to use the name "Drake" were purchased by the Drake Management Company, incorporated on September 25, 1933. The accounts receivable were purchased by Brashears.

It was further found by the master that the Metropolitan Life Insurance Company during all the times referred to herein was lawfully licensed under the Illinois insurance statutes to engage in the life insurance business, but that it had never obtained a license from the state of Illinois under the General Corporation Act of that state to transact business as a foreign corporation.

■ Appellants' first contention is that the loaning of money by an insurance company is a business separate and apart from that of writing insurance, hence, they urge, it was necessary for the Metropolitan Life Insurance Company, before it could legally loan money in Illinois, to secure a license pursuant to the provisions of the Illinois General Corporation Act, notwithstanding the fact that it at all times in question held a license from that state to do a life insurance business. They base their contention upon certain provisions of the General Corporation Act of Illinois, and other unrelated statutes, referred to by them as follows: The Act of 1875—Smith-Hurd Ann. St. c. 32, § 211, Cahill's Illinois Revised Statutes 1933, c. 32, par. 298; the Act of 1879— Smith-Hurd Rev. St. 1931, c. 73, § 56, Cahill's Illinois Revised Statutes 1931, c. 73, par. 71; statute in relation to filing certificate of authority and/or license granted— Smith-Hurd Rev. St. 1931, c. 32, § 131, Cahill's Illinois Revised Statutes 1931, c. 32, par. 131; the Act in relation to foreign corporations—Smith-Hurd Rev. St. 1931, c. 32,

§ 84, Cahill's Illinois Revised Statutes 1931, c. 32, par. 84; statute in relation to the schedule of personal property under the Revenue Act—Smith-Hurd Ann. St. c. 120, § 13, Cahill's Illinois Revised Statutes 1933, c. 120, par. 13.

We are of the opinion, however, that the General Corporation Act of Illinois has no applicability whatever to insurance companies conducting an insurance business in Illinois under a license so to do issued by that state, even though such insurance companies loan their money and take security therefor within that state. In In re Peoria Life Insurance Company, 75 F.(2d) 777, decided February 11, 1935, this court held that an insurance company, aside from the mere issuance of policies, has the highest duties and powers to protect its policies and the investments which they represent, and has all incidental powers reasonably necessary to the performance of those duties. We can conceive no higher duty of an insurance company than that of investing its money and taking security, for upon its success in this respect the success of the entire structure depends. We are in accord with the reasoning and conclusions in Bankers' Life Company v. Horsfall, 48 S. D. 629, 205 N. W. 714; and John Hancock Mutual Life Insurance Company v. Lookingbill (Iowa) 253 N. W. 604. A perusal of the Illinois statute and decisions discloses no tendency on the part of the Legislature or courts to construe the statutes in any manner inconsistent with this holding. The General Corporation Act of June 28, 1919, as amended (Smith-Hurd Rev. St. 1931, c. 32, § 1 et seq., chapter 32, Cahill's Rev. Ill. St. 1931 [section 1 et seq.]) was in force when this mortgage was executed. Section 80 et seq. of that act, as amended (Smith-Hurd Rev. St. 1931, c. 32, § 80 et seq.) relate to foreign corporations, and except insurance companies from its operation. A reasonable construction of the Illinois Insurance Acts of March 26, 1869, June 18, 1883, June 7, 1889, April 18, 1899, and May 20, 1907, as amended, found respectively in Smith-Hurd Ann. St. c. 73, §§ 205 et seq., 60, 290, 240, 261, Cahill's Rev. St. 1933, c. 73, pars. 315 et seq., 76, 393, 357, and 375 recognizes the incidental right of a life insurance company, foreign or domestic, to invest its funds in Illinois.

■ Appellants' contention that the insurance company was estopped to deny that their lien, leasehold and annuity interests by virtue of their operating contracts of 1919 and 1932, were prior and superior to the mortgage lien is based upon the assumption that those contracts created a lien in their favor. That assumption we can not admit. Whatever rights may have been created by the contract of 1919 were clearly released and abandoned when the contract was canceled in 1932. The 1919 contract under a reasonable construction and under the construction placed upon it by the parties themselves, and by its express terms, was clearly one of employment, and the right to possession of the premises by the Drakes or the Drake Hotel Company was purely incidental to and dependent upon the continuation of the contract. It created no lien or title to, or annuity in, the property. The same may be said of the contract of 1932, with the further observation that it was intended by all parties interested to be, and was in fact, executed after the mortgage lien attached. Furthermore, the Drakes are in no position to claim under the 1919 contract until they have made a sufficient tender of the consideration received for canceling it. Vance v. Chicago Portrait Company (C. C. A.) 19 F.(2d) 981; Babcock v. Farwell, 245 Ill. 14, 91 N. E. 683, 137 Am. St. Rep. 284, 19 Ann. Cas. 74.

■ It is next contended that the receiver had no power to cancel the employment contract. With that contention we can not agree. It is not open to doubt that a corporation receiver, either under a creditor's bill or a bill to foreclose, has the right to disavow contracts, made by the corporation, which are burdensome to the estate, where there is no lien. Southern Express Company v. Western N. C. Railroad Company, 99 U. S. 191, 25 L. Ed. 319; Sunflower Oil Company v. Wilson, 142 U. S. 313, 12 S. Ct. 235, 35 L. Ed. 1025; United States Trust Company v. Wabash Railway Company, 150 U. S. 287, 14 S. Ct. 86, 37 L. Ed. 1085; Union Trust Company v. Curtis, 182 Ind. 61, 105 N. E. 562, 566, L. R. A. 1915A, 699. In the last case cited, the court said, "The rule is that the receiver is not bound by a contract made by the company before his appointment, which does not constitute a lien on the property, and he cannot be compelled to perform it. The contract is that of the company, and for a breach of it the company, and not the receiver, is liable." This rule applies to employment contracts (In re Seattle L. S. & E. Ry. Company (C. C.) 61 F. 541; Birmingham Trust & Savings Company v. Atlanta B. & A. Railway Company (D. C.) 271 F. 731), and also to leases. United States Trust Company v. Wabash

Railway Company, supra. That it applies to both contracts of employment here referred to we think there can be no question. See, also, Tidd v. General Printing Company, 257 Ill. App. 596; Gerkhardt v. Mandarin Company, 182 Wis. 11, 195 N. W. 910.

From a perusal of this record we are unable to discern any lack of equity on the part of the Metropolitan Company. We have examined the alleged errors with respect to the exclusion of evidence and the failure to make requested findings of fact, and we are convinced that the evidence was properly excluded and the requested findings properly refused on the ground of immateriality.

Our study of these cases has been rendered unnecessarily difficult and laborious by reason of the very voluminous records filed in each, most of the contents of which are identical in the two. For instance, although the cases were heard together in the trial court and referred together to a master so that the statement of evidence was the same in both, appellants saw fit to set it out in full in each case, filling 358 pages of each record with identical matter. The same forty-eight errors were assigned in both causes and set out in full in each. Each party filed duplicate sets of briefs, with the exception of the first few pages of appellants' briefs, and the further exception that the receiver properly filed a single brief bearing the docket number of both causes. The effect of all this duplication is to prolong the labor of the court, and to increase the costs of the litigation beyond all reason.

Decrees affirmed.