## VANCE v. CHICAGO PORTRAIT CO.

Circuit Court of Appeals, Seventh Circuit.
May 25, 1927.

Rehearing Denied July 22, 1927.

No. 3636.

1. **Account stated** ⟐⟿8—**Compromise and settlement** ⟐⟿17(1)—**Correctness of account reached on settlement after terminating employment contract held not subject to dispute as to period when monthly statements were furnished.**

Where agent, pursuant to contract of employment, was furnished with monthly statements during period of employment from 1902 to 1916, with exception of period from January 1, 1915, during which time some statements were furnished, and upon termination of contract entered into settlement agreement, he cannot in-

quire into correctness of account beyond January 1, 1915.

2. **Account stated** ⟐⟿13—**Compromise and settlement** ⟐⟿19(3)—**Attack on statements and settlement held barred by laches.**

Employee's attack on statements rendered and settlement made with employer held barred by laches.

3. **Account stated** ⟐⟿19(3)—**"Account stated" and payment thereof held shown by transactions.**

Transaction between parties showed an "account stated" and payment thereof.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Account Stated.]

4. **Compromise and Settlement** ⟐⟿6(3)—**Dispute relative to accounting under employment contract held proper basis of compromise.**

Dispute between employer and employee relative to accounting being proper subject of litigation was therefore proper basis of compromise.

5. **Compromise and settlement** ⟐⟿18(3)—**Sums paid should be returned before suing to set aside settlement.**

One seeking to set aside a settlement agreement should return the sums paid him before bringing suit.

6. **Appeal and error** ⟐⟿1019—**Master's determination of issue of fact on conflicting evidence is persuasive.**

Determination of issue of fact by master on conflicting evidence is persuasive.

7. **Compromise and settlement** ⟐⟿16(1)—**Action taken by employer and employee on disputed item during accounting and compromise held conclusive.**

Where, at time of settlement between employer and employee covering a period of years, employee made a claim for a certain item, which was taken into consideration in accounting and compromise, action then taken was conclusive on the parties.

Appeal from the District Court of the United States for the Eastern Division of the Northern District of Illinois.

Suit by L. F. Vance against the Chicago Portrait Company. From the decree, plaintiff appeals. Affirmed.

Harold F. Wilke, of Chicago, Ill., for appellant.

John T. Evans, of Chicago, Ill., for appellee.

Before ALSCHULER, EVAN A. EVANS, and ANDERSON, Circuit Judges.

EVAN A. EVANS, Circuit Judge. Appellant sued for an accounting and to collect moneys due him for services rendered as a salesman covering a period of 14 years

(1902–1916). The facts, briefly narrated, are as follows:

Appellee, an Illinois corporation, was engaged in the business of enlarging photographs and selling frames. Appellant, a resident of Minnesota, was one of its salesmen. The contract of employment was in writing (extracts of which are set forth below)[1] and provided for its termination by either party on 30 days' notice. One paragraph gave the appellee the right to purchase appellant's stock in the company at the termination of the contract.

Appellee terminated the contract in the fall of 1916. On November 11, 1916, a settlement was made. Appellee purchased appellant's stock and gave its notes therefor. It paid the balance agreed upon in the settlement. Appellant seeks to set aside the settlement and to secure an accounting for the entire period, 1902 to 1916.

A first reference was had to determine whether there should be any accounting. The master reported in favor of appellant, but limited the period—January 1, 1915, to March 11, 1916. A second reference was then made to the same master, who heard the testimony and reported that there was due appellant for such period $744.62. There was included in the bill a demand for the payment of an undisputed item (amounting to about $18,000), being the sum due on certain notes given for the stock which the appellant surrendered when the settlement was made. This item was never disputed. The controversy centered about other items hereafter considered.

The court confirmed the report of the master. It also disallowed defendant's counterclaim, which was based upon paragraph 6 of the contract. This paragraph provided for a $5,000 penalty in case of a breach of the contract. The court refused to enforce this penalty. A decree was duly entered, from which appellant prosecuted this appeal. Appellee paid the amount fixed by the decree, into court.

The various assignments of error may best be considered under two heads: First, did the court err in restricting the field of inquiry to a date beginning January 1, 1915? Second, was appellant entitled to recover more than was found by the master?

The order limiting the accounting to a period that began January 1, 1915, was based largely on the complete report of the master, the material parts of which are herewith set forth:

"On November 10, 1916, Vance, bringing with him John Crowley, an osteopath physician of Minneapolis, came to Chicago to

---

[1] "It is * * * agreed that * * * this contract may be terminated by either party upon giving the other party thirty (30) days' notice of his or its intention so to do, or it may be dissolved at any time by mutual consent, but if not dissolved by mutual consent, or by notice as aforesaid, shall be taken and accepted to be a continuous contract.

"It is further agreed that second party agrees to devote his entire time and attention to first party's business, and to obey all orders and directions given him by first party or its authorized representatives, and to engage in no other business or undertaking during the life of this contract.

"Sec. 2. It is further agreed that second party as his principal duty, which will follow him through his position as road manager, will be the producing of business for the said first party either by means of soliciting orders for the enlargement of pictures or photographs, or both, or delivering or collecting for pictures or frames, or either or the advising, counseling, directing and encouraging others in so doing, either as solicitor, collector, deliveryman, crew manager, district manager, road manager, correspondent or officer of first party, and it is further understood and agreed that the success of said first party depends upon its business produced by the loyalty, energy, competency and faithfulness of its employees.

"Sec. 3. It is further agreed by and between the parties hereto, that the term 'engage or engaging in the portrait business' as hereinafter used in this contract, means the soliciting orders for the enlargement of photographs or pictures, the sale of picture frames, either with or without pictures, the delivery of either or both, the collecting of money on account of the delivery of either one or the other, or both, either on his own behalf, or for any third person, firm, or corporation, or directing, managing, or encouraging others so engaged, either as collector, deliveryman, solicitor, crew manager, district manager, road manager, general road manager, either personally or by means of correspondence."

"Sec. 6. It is further agreed said parties having considered the damages which might or will occur to first party by reason of the violation of the provisions of this contract by second party and having agreed upon a stated amount as being the fair and true measure of such damages, it is agreed that if said second party shall violate this agreement, he, said second party, shall pay the sum of five thousand ($5,000.00) dollars to first party as its agreed liquidated damages, and upon his neglect or refusal to pay on demand, said sum of five thousand ($5,000.00) dollars to first party, first party is authorized to set off the same against any earnings, dividends or profits in said first party's possession, or stock owned by second party in first party.

"Sec. 7. * * * It is further agreed * * * that second party agrees to sell all of the said stock so assigned and which he may thereafter acquire, or which he may then own in first party to first party for the sum of one hundred ($100.00) dollars, for each and every share thereof. * * *"

make settlement with the Portrait Company. Crowley on the day of their arrival went alone to the office of the company and arranged for a meeting on the following day, Saturday, November 11th, and at that time Vance and Crowley went to the office of the company and negotiations for the settlement began. Edgar Walker, an employee of the company, familiar with its books of account, acted as the representative of the company in making the settlement, under a written power of attorney executed at that time by the company. The settlement proceedings continued on Saturday and on Sunday until some time in the afternoon, when an agreement was reached. The bookkeepers were present during practically all the time to render such services as might be required, and the books were present for inspection.

"On the 14th day of August, 1916, the day that Vance's employment under his contracts expired, the company opened a new account with him, called account No. 2, and carried in that account entries in regard to transactions occurring prior to August 14th. These accounts were both balanced on the books of the company as of November 1, 1916; No. 1 showing a credit balance of $4,441.18, and No. 2 a debit balance of $1,362.80. These balances were not disturbed, but were accepted and taken as the starting point in the settlement.

"The books were brought down to date. This was a short operation, as there were but three entries, two for commissions allowed under date of November 8th and November 10th, and entered in account No. 1, and one a debit entry for money advanced to Mr. Vance, and entered in account No. 2. Vance then brought forward claims for credit on account of money advanced by him to agents, for which the agents had given him orders on their accounts with the company. These matters were discussed and agreed upon, and credit entries were made in Vance's accounts on the books under date of November 11th. Vance also made claim for money paid out by him on account of a hotel bill contracted by his father, that Vance claimed the company should be required to pay. This was at first resisted, but finally adjusted, and a credit entry made in account No. 1 under date of November 11th. Vance also brought forward his monthly expense bills for the months of May, June, July, August, September, and October, 1916. These were adjusted, and credit entries made in his accounts. A debit entry was also made in account No. 1, representing a credit to the company growing out of these expense accounts.

"After the above entries were made, the accounts were balanced as of November 11th; No. 1 account showing a credit balance of $5,175.01, and No. 2 a debit balance of $378.75. The entries in the two ledger accounts, beginning with the balances at November 1st, were then copied on a so-called settlement sheet. Master's Exhibit A, Plaintiff's Exhibit 18. The debit balance in the No. 2 account was then deducted from the credit balance in the No. 1 account, leaving a credit balance of $4,796.26.

"Questions arose as to whether Vance was entitled to credit for interest on monthly balances, dividends on his stock for a portion of the year 1916, commissions in the Radebaugh field after August 14, 1916, and compensation on account of unfinished business in his territory, and after the above balance was struck the parties proceeded to further discussion of these questions. Walker took the position that Vance was not entitled to anything on account of any of these items, except what might be due him on unfinished business.

"Those present were desirous that a settlement be reached, and urged the parties to come to an agreement. After some further discussion, $1,300 was agreed upon as the amount that should be allowed to cover all questions in dispute between the parties, and the release shown on the settlement sheet was written and signed. The $1,300 was entered on the settlement sheet and added to the balance of $4,796.26, making a total due Vance of $6,096.26. A check for this amount was given to Vance by the company; the check bearing on its face and on its back the words "In full settlement as per statement of even date." This check was afterwards cashed by Vance.

"It had been the practice of the Portrait Company, extending as far back as the time when Vance entered into his road manager's contracts in 1904, to prepare and deliver monthly to its employees, filling positions such as Vance held, expense and credit statements and delivery statements. The expense and credit statements showed the debits and credits in the ledger account for the particular month; the delivery statements showed the number of frames and portraits sold for cash, upon which the road manager would be entitled to commission. The delivery statements did not show the sale of frames for which notes were taken, but statements, called note statements, showing sales of frames on which notes were taken, were also sent out monthly. In addition to the above, the company sent out a quarterly statement

to road agents, showing their net earnings for the quarter.

"It was also the practice of the company to require employees to approve the current monthly statements, or point out errors therein, before sending out the following month's statements, so that all questions that might arise should be disposed of monthly. This practice of the company was adhered to throughout the entire period of Vance's employment. Up until the month of February, 1914, Vance received statements monthly, and either accepted them or pointed out errors that were adjusted between the parties. Some time in the year 1914 Vance began to fail to approve or point out errors in the statements, and the company in such cases failed to send him statements; but by the end of 1914 he had received all or practically all statements that had not theretofore been sent to him, and such statements were accepted, or errors were pointed out, that were adjusted between the parties, and all matters between Vance and the company were fully agreed upon and settled up until the close of the year 1914.

"It is apparent that some time in 1914 or 1915 the relations between Vance and the Portrait Company became less cordial and less satisfactory than they had been theretofore, and relations gradually became more strained until they were severed as heretofore stated.

"The expense and credit statements for 1915 were not delivered regularly during the year, but the evidence indicates that all or practically all that remained undelivered were delivered at the close of the year. The evidence is vague and unsatisfactory on this question. The delivery statements for 1915 were not all delivered during that year; the bulk of them were turned over to him in the summer of 1916.

"The expense and credit statements for 1916 were delivered to Vance during the settlement proceedings though he may have received a few during the year. The delivery statements for 1916 were handed to him about an hour after the release was signed, but before the parties separated.

"All matters of every kind growing out of the business relations existing between plaintiff and defendant from the time plaintiff entered the employ of defendant under his road manager's contract in 1904 until the end of the year 1914 were settled and disposed of as they went along.

"The settlement made on November 11th did not include the question as to whether the entries on the books of the defendant or the statements furnished to the plaintiff from the beginning of 1915 to the time of the settlement were true and correct. The defendant presented its books at the time of the settlement showing balances in the accounts in which plaintiff was interested. The representation of the books showing these balances amounted to a representation on the part of the defendant that the books had been correctly kept and that the balances were correct balances. The plaintiff relied upon this representation and believed it to be true, and did not attempt to verify or point out errors in the books during the settlement.

"The settlement of November 11, 1916, was fairly made, and is conclusive upon the parties as to all matters included or intended to be included in such settlement.

"The plaintiff is entitled to an accounting, for the purpose of ascertaining whether the books and records of the business were correctly kept during the years of 1915 and 1916, up to the time of the settlement, but is not entitled to an accounting on any other question."

[1, 2] Appellant is prevented from inquiring into the correctness of the account beyond January 1, 1915, for three distinct reasons: (a) The settlement of November 1, 1916. (b) The action of the parties in presenting monthly statements—in approving or correcting these statements immediately, and the making of yearly settlements. (c) Laches of appellant in attacking these statements.

Hemmick v. Standard Oil Co. (C. C. A.) 91 F. 333, is applicable to the facts here:

"That he did neither, but supinely suffered the matter to rest upon the firm's acceptance of a stated sum, without complaint through all these years, are weighty facts, and, in the absence of any substantial explanation, conclusive against him when, years afterwards, he comes into a court of equity, and prays an enforced accounting. Assuredly, he cannot complain that such accounting is denied him, when he has taken absolutely no steps during these years to secure a voluntary one, or to place himself in a position to enforce one by law. Stale claims are not regarded with favor by courts. Statutes of limitations are for the general good, and their wholesome application in most cases best subserves the ends of justice. The application by a court of equity of analogous principles, even when the statutes of limitations do not apply, is one of the beneficent powers lodged in the hands of a chancellor."

In Whitney v. Fox, 166 U. S. 647, 17 S.

Ct. 713, 717 (41 L. Ed. 1145), where there was no settlement or stated account involved, the court said:

"Equity will sometimes refuse relief where a shorter time than that prescribed by the statute of limitations has elapsed without suit. It ought always to do so where, as in this case, the delay in the assertion of rights is not adequately explained, and such circumstances have intervened in the condition of the adverse party as render it unjust to him or to his estate that a court of equity should assist the plaintiff."

In McKnight v. Taylor, 1 How. 168 (11 L. Ed. 86) the court said:

"It is not merely on the presumption of payment, or in analogy to the statute of limitations, that a court of chancery refuses to lend its aid to stale demands. There must be conscience, good faith, and reasonable diligence, to call into action the powers of the court. In matters of account, where they are not barred by the act of limitations, courts of equity refuse to interfere after a considerable lapse of time, from considerations of public policy, and from the difficulty of doing entire justice, when the original transactions have become obscure by time, and the evidence may be lost."

Corpus Juris says:

"Laches on the part of the person seeking to reopen an account stated may of course be grounds for denying relief and, as a general rule, courts will not open settlements that have been acquiesced in for a long time. The reason of the rule is that lapse of time necessarily obstructs the truth and destroys the evidence of past transactions."

Other cases holding similarly are McClean v. Bradley (D. C.) 282 F. 1011; Penn Mutual Life Insurance Co. v. Austin, 168 U. S. 685, 18 S. Ct. 223, 42 L. Ed. 626; New York City v. Pine, 185 U. S. 93, 22 S. Ct. 592, 46 L. Ed. 820; Galliher v. Cadwell, 145 U. S. 368, 12 S. Ct. 873, 36 L. Ed. 738.

[3] The dealings of the parties disclose more than the existence of an account stated. They show an account stated and payment thereof. In Hawley v. Harran, 79 Wis. 379, 48 N. W. 676, the court said:

"Treating it [the account] as merely an account stated, it was conclusive upon both parties, and was impeachable only for fraud or mistake. * * * But this was more than a mere account stated, the correctness of which had been assented to. There was an unconditional promise to pay the amount, according to the testimony of the plaintiff. That promise was based on a good consideration, and was a good cause of action in itself.

It could be avoided only by proof that the defendant was induced to make the promise by fraud." Miller v. Chippewa County, 58 Wis. 630, 17 N. W. 535.

Certainly a promise to pay the balance due, or an actual payment of the balance by the debtor, adds materially to the weight the court should give to the binding effect of an account stated. 1 Corpus Juris, 713.

Likewise the fact that the debtor did not see fit to question the correctness of these statements until certain records of the company were destroyed weakens his standing in a court of equity. Of course, the company should not be permitted to escape liability on the theory that its records were not in existence, if it appeared that their destruction occurred in an effort to avoid liability. We do not find any evidence, however, that would justify the conclusion that these records were destroyed to prevent the ascertainment of the correct amount due appellant. They were destroyed only after the lapse of years, and after annual settlements had been made with appellant and others similarly situated.

Appellee's business involved a tremendous number of small items. To preserve a record of each order for an enlargement of a photograph or for each picture frame sold would have necessitated large storage space. The large rental charges would be disproportionate to any benefit the company might reap by reason of the existence of the records. Moreover, the appellee's books were not destroyed. To ascertain whether they were correctly kept the master caused a check on them to be made. He appointed an accountant to examine the books and directed him to compare vouchers, orders, or other memorandum used on the trial with the entries in the book. In every instance the entries were correct.

[4] Moreover, the settlement of November 11, 1916, afforded additional reasons for sustaining the master's report. The dispute between these parties being the proper subject of litigation was therefore the proper basis of a compromise. Our duty being to encourage, rather than discourage, an amicable settlement of conflicting claims, we are at a loss to understand why the settlement of November 11, 1916, should not have closed the matters therein settled. The evidence shows that this settlement was freely and voluntarily made. If there exists any trace of duress, it is on the side of appellant. He was unfriendly, and was accompanied by one whom he introduced as his adviser. There was no fiduciary relation existing be-

tween the parties to this litigation. In fact, for some months a hostile feeling had existed. When appellee terminated the contract, all pretense of friendliness or trusting confidence had disappeared. The parties met at arm's length.

[5] Upon the effectuation of the settlement, appellee paid and appellant accepted $6,-096.26. Appellant also executed a release of which the following is a copy:

"In compromise settlement of all claims for salary, commission, compensation, disbursements and all other claims of L. F. Vance against Chicago Portrait Company, on all business, dealings, or transactions between them to date, including all claims of Vance on all delivered or outstanding business, the parties to this account having settled all disputes and accounts to date, on the basis of this statement.     Balance as above.

"O. K.:  L. F. Vance.     ·

"Received check for above amount.

"L. F. Vance."

Appellant asks this court to set aside the settlement, without returning or offering to return the moneys he received pursuant to the settlement.    Appellee cites many cases supporting its contention that one seeking to set aside a settlement must tender back the moneys paid pursuant thereto as a condition to such rescission.   Grymes v. Sanders, 93 U. S. 55, 23 L. Ed. 798;  Eclipse Bicycle Co. v. Farrow, 199 U. S. 580, 26 S. Ct. 150, 50 L. Ed. 317;  United States v. Harvey Steel Co., 196 U. S. 310, 25 S. Ct. 240, 49 L. Ed. 492; Dunbar v. Am. T. & T. Co., 224 Ill. 9, 79 N. E. 423, 115 Am. St. Rep. 132, 8 Ann. Cas. 57;  Babcock v. Farwell, 245 Ill. 14, 91 N. E. 683, 137 Am. St. Rep. 284, 19 Ann. Cas. 74.  6 Ruling Case Law 936–940, states the rule as follows:

"The very idea of rescinding a contract implies that what has been parted with shall be restored on both sides.  That one party should be released from his part of the agreement, and that he should be excused from making the other party whole, does not seem agreeable to reason or justice. Hence the general rule is that a party who rescinds an agreement must place the opposite party in statu quo. * * * The whole doctrine of refund upon repudiation of a contract of settlement is not technical, but equitable, and requires merely that the practical rights of the other party shall not thereby be prejudiced;  that he shall be no worse off than if he had never made the contract of settlement. * * * As a general rule, where a party seeks to be relieved from a contract upon the ground that it was in-duced by fraud, he must, except so far as he has some legal excuse for failure, restore his adversary to the position he was in at the time of the contract, and there can be no rescission as long as he retains anything received under the contract, which he might have returned, and the withholding of which might be injurious to the other party. * * * Hence in such a case the plaintiff must fail, unless he is able to show that, before he commenced the action, the contract relations between him and the defendant, which were fatally tainted with fraud, had been wholly severed, so far as was reasonably within his power to accomplish it.  That requires the complainant, before commencing suit, to return, or offer to return, that which he received, or to show willingness and ability to return the same, and such conduct on the part of the wrongdoer as to show that a formal tender or offer would have been wholly useless."

In view of appellant's asserted difficulties with numerous attorneys, and his earnest insistence that there is a large sum of money due him, we have approached this second branch of the case as though appellant was in no way embarrassed by the retention of the moneys paid him pursuant to the settlement.   We have also assumed, as found by the master, that "the settlement on November 11, 1916, was fairly made and is conclusive upon the parties as to all matters included or intended to be included in such settlement," and that "the plaintiff is entitled to an accounting for the purpose of ascertaining whether the books and records of the business were correctly kept during years 1915 and 1916 up to the time of the settlement."

The proceedings that occurred on the second reference as well as the conclusions of the master may best be presented in the language of the report:

"The defendant's account filed May 31, 1923, shows Vance's account with the company in the form of debit and credit and shows that according to the books Vance had received credit for all that was due him on business produced in 1915, and that in 1916 he received credit on business produced in his own field prior to August 14th and closed out before November 11th, and on business in the Radebaugh field produced and closed out before August 14th, but the account fails to show all credits Vance is entitled to for the period August 14 to November 11, 1916, as hereinafter stated.

"It has been the custom of defendant for many years to keep the reports sent to and

received from its different agents for a period of about five years, and to then destroy them, and at the time of the re-reference all such papers up to and including 1917, with the exception of a few months in 1915 and 1916, had been destroyed. The question arose as to whether items shown on the road sheets and settlement sheets had been correctly entered on the defendant's books, but on the basis of the months for which complete records are available it is found that the books have been correctly kept.

"Vance's road manager's contract provided that his compensation should be the usual percentage of earnings theretofore paid to road managers. The company, in calculating a road manager's compensation, took one-third of a profit figure arrived at on a basis adopted by it, and such compensation was loosely spoken of as being one-third of the net earnings, and was so erroneously described in the master's first report.

"Vance takes the position that under the contract he was entitled to one-third of the net earnings in his territory, figured on an exact basis, and that the company in computing earnings used excessive cost figures. This contention has not been accepted. The contract provides that Vance's compensation should be the usual percentage of earnings paid road managers, and that he has received.

"It is true the company did not determine its costs with absolute accuracy. The nature of the business made it necessary to have a cost figure at the beginning of a quarter to apply against each shipment going to the different road managers' territories, and such costs were estimated on the basis of the previous quarter. The method used by the company was in effect when Vance entered into his contract, and remained in effect throughout the entire period of his service with the company, and his compensation was ascertained in the same manner as that of all other road managers. From the beginning of his employment under this contract, until at least May, 1915, Vance received quarterly statements showing his earnings thereunder, and monthly statements showing the condition of his account, and, as they were received, acknowledged the receipt of such statements and their correctness, or pointed out errors that were adjusted.

"Under the oral arrangements of 1913 and 1915, whereby Vance was to receive commission on frames in his road manager's territory, the company credited him with commissions on frames sold for cash, but did not give him credit in cases where frames were sold and notes taken therefor.

"Vance says he should have received commission on all frames sold. This contention has not been accepted. The arrangements were verbal and the terms are not clearly defined by the only testimony on the subject, given by Vance at pages 73–78 of the original record, that testimony being vague and unsatisfactory. Stephen M. Paine, who represented the company in the arrangements, died before Vance gave his testimony. To ascertain what the parties had in mind, recourse must be had to the course of dealings and the interpretation placed upon the contract by the parties themselves in carrying it out. The evidence shows it was the practice of the company, following in all cases throughout the period of Vance's service, where an agent was allowed commission on frames, not to allow commission on frames sold on notes, and the statements received by Vance from the time of the first arrangement in 1913 until at least May, 1915, were sufficient to inform him that the company was not crediting him with commission on all frames sold.

"At this point it may be well to mention that in the first report it was inaccurately stated that the delivery statements showed only sales of frames that were made for cash, whereas in fact they showed total frame sales.

"Vance claims that the commission of 25 cents a count, provided in the 1915 and 1916 general road manager's contracts, applies to all business of the company including frame sales. The company takes the position that the term 'count' applies only to portrait sales. Vance's contention has not been accepted.

"The contract provides: 'A count is to be understood as an order for goods amounting to $3.98, or such other amount as the parties hereto may hereafter agree.' The company claims that in the course of its business, where the term 'order' was used, it was intended to apply to the sale of portraits only. The portrait business and the frame business have always been handled differently. Solicitors in the field take orders for portraits, but do not take positive orders for frames. When the portraits are sent to the agents in the field for delivery, who are different from the agents taking the orders, frames are sent with them, and the agent making the delivery endeavors to induce the purchaser of the portrait to also buy a frame.

"The company in its practice did not apply counts to frames, or allow Vance any-

thing on account of frame sales under these contracts, and the testimony indicates Vance understood the company by its practice applied the term 'count' only to portrait business.

"Vance at the settlement of November 11, 1916, brought forward his claim for an allowance of commission on frame sales under his general road managers' contract, and Walker, who was representing the company, declined to allow anything on such claim, and later along the settlement paper was made and signed by the parties.

"As stated in the first report, Vance's business had been carried in two accounts on the books of the company, known as accounts No. 1 and No. 2. These accounts had been brought down to November 1st, and in arriving at the settlement the parties started with the balances shown therein. Vance relied on the statements of representatives of the company, and believed the books were correct, and the balances included all business produced after as well as before August 14th, closed out by November 11th. Walker representing the company understood that the business in Vance's own field had been treated the same after August 14th as before, and testified on the original hearing that the credits to Vance on such business had been entered into account No. 2. Original Record 278–281. On the re-reference it was found Walker was mistaken; that, while the No. 2 account was opened on August 14th, debits only were entered therein. The company continued to give Vance credit in account No. 1 for commissions on frames, and for commissions on counts in his own field on business produced prior to August 14th as such business was closed out, and for his road manager's earnings up to September 30th on business produced prior to August 14th, but no credit was given him on business produced and closed out between August 14th and November 11th.

"It may be said here that the question of Vance's compensation for business outstanding on November 11, 1916, was taken into account and disposed of in the settlement as stated in the first report.

"After the conclusions above set forth had been arrived at, the accountant appointed by the master was directed to examine the books of the defendant and prepare a statement in accordance with such conclusions. The accountant made the examination and prepared and submitted a statement, introduced in evidence as Master's Exhibit 2, showing that there is due to Vance * * * $744.62."

Respecting the attack made upon this report and the order of the court confirming it, little need be said. We find the evidence amply supports the conclusions of the master. Having seen and heard the witnesses, he was in a better position than we are to intelligently determine the weight of the testimony.

Some circumstances, concerning which there was no dispute, strongly support the report. To illustrate: The contract provides that appellant's compensation should be "the usual percentage of earnings theretofore paid to road managers." This compensation was generally referred to as 33⅓ per cent. of the profits. In determining cost (that the company's earnings might be ascertained), the deductions complained of were made. Yet it was the same manner of determining cost that had been in force for the entire 14-year period. It was the accepted basis for fixing the compensation of every other road manager. This contemporaneous construction of the meaning of the language of the contract by appellant, as well as by all other road managers, is not only significant, but is most persuasive.

[6] Respecting the extra compensation which appellant demands for frames sold, there is no such persuasive circumstances to aid this court. The testimony, however, was conflicting, and the determination of this issue by the master cannot be disturbed.

[7] As to the item of 25 cents for each "count," there is some documentary proof. Statements furnished by appellee to its road managers in 1916 of a corroboratory nature appeared in the evidence. They distinguished between "counts" and "frames." Moreover, appellant made a claim for this item when the settlement of November 11, 1916, was negotiated, and the action then taken is conclusive upon the parties now.

The decree is affirmed.