Norman L. Olson, Successor-Trustee, Appellee, v. Franklin Eulette and Elmore Real Estate Improvement Company, Appellants.

Gen. No. 10,138.

Opinion filed July 23, 1947.
Rehearing denied September 23, 1947.   Released for publication September 24, 1947.

HERSHENSON & HERSHENSON, of Chicago and RUN-
YARD & BEHANNA, of Waukegan, for appellants;
HARRY G. HERSHENSON and JAMES B. McKEON, both of
Chicago, of counsel.

ASHCRAFT & ASHCRAFT, of Chicago, for appellee;
ALAN E. ASHCRAFT, Jr., of Chicago, of counsel.

MR. JUSTICE BRISTOW delivered the opinion of the
court.

This is an appeal from a decree of the circuit court
of Lake county adjudging that a recorded real estate
contract dated April 20, 1943, between plaintiff, Nor-
man L. Olson, and defendant, Franklin Eulette, be de-
clared null and void as a cloud on plaintiff's title, and
dismissing for want of equity defendants' counter-
claim for specific performance.

Although the record is voluminous and replete with
contradictions, the sole issue is whether the disputed
contract was a fraud upon the plaintiff.

Under an agreement dated April 21, 1939, plain-
tiff, as owner of certain subdivided real estate in Lake
county, gave defendant Elmore Real Estate Improve-
ment Co., a corporation, hereinafter referred to as
"Elmore," the exclusive right of sale of the property.
This agreement provided that Elmore retain 40 per
cent of the purchase price of the individual tracts in
the Biltmore subdivision, which included the property
involved in the disputed contract, and contained a
minimum price list below which the tracts could not be

sold. It further specified that if plaintiff received within five years the sum of $156,000 from the sale of the property in the subdivision, then as "added compensation," Elmore would receive a deed to the remainder of the real estate therein; otherwise, at the end of the five year period, Elmore would have no further interest in the subdivision.

Defendant Elmore contends that this contract created an agency coupled with an interest, whereby the corporation was entitled to indirectly become the purchaser of the property without disclosing that fact to the principal.

This contention can be summarily dismissed. Not only is it contrary to defendants' fundamental tenet that the defendant Eulette, and not Elmore, was the bona fide purchaser under the disputed contract, but it is untenable as a matter of law.

CHIEF JUSTICE MARSHALL in the leading case of *Hunt v. Rousmaniere,* 8 Wheat. 174, which is followed by the Illinois courts (*Bonney v. Smith,* 17 Ill. 531), promulgated the rule that for an agency to be coupled with an interest there must be vested in the agent an interest or estate in the property which is the subject of the agency as distinguished from the proceeds or result of the exercise of the agency.

In the instant case Elmore had the exclusive right to sell the property, but under the plain terms of the contract he was entitled only to retain 40 per cent of the sale price of each tract, irrespective of how much above the minimum price the vendee paid. This agreement, therefore, clearly does not fall within the category of agencies where a broker receives for his services all above a minimum price. Moreover, Elmore was not entitled to any "additional compensation" or other rights with reference to the property until and unless plaintiff received $156,000 from the sale of the tracts within five years. There is no evidence or assertion that Elmore paid plaintiff the

specified $156,000, and, therefore, Elmore's interest was only in the 40 per cent commission from the proceeds derived from the exercise of the agency, rather than in the property itself. Furthermore, he was in no way obligated to make improvements on the property, nor to sell any part thereof.

Under the established criterion, therefore, the contract between the plaintiff and defendant Elmore created a simple agency rather than an agency coupled with an interest. This interpretation is further supported by the provision in the contract which authorized Elmore to buy the lots for the sole purpose of building residences thereon, and which, by implication, negatives any construction that Elmore had a right to buy the property under other contingencies.

The conduct of the defendant Elmore must, therefore, be adjudged under the recognized canons appertaining to the principal and agent relationship. The fiduciary nature of this relationship has been reiterated by the Illinois courts.

In *Lerk v. McCabe,* 349 Ill. 348, the court stated at p. 361:

"An agent cannot directly or indirectly acquire an interest in his principal's business without the principal's consent freely given and with full knowledge of every matter known to the agent which might in any way affect the principal's interest, and it is of no consequence that no fraud was intended or that no advantage was derived by the agent."

Pursuant to the agency agreement, Elmore, on April 14, 1940, entered into contract 1074 for the sale of a particular tract to one Engbrecht, who, subsequently, became delinquent in his payments thereon. Defendant Elmore alleges that on April 20, 1943, Engbrecht desired to exchange the property under contract 1074 for another and more expensive lot, which, Elmore claims, he had contracted, that same day, to sell to defendant Eulette.

According to the testimony of Grover C. Elmore, president of the corporation, sometime in March 1943 defendant Eulette directed Elmore to take $100 out of Eulette's account for deposit on this particular tract. On April 20, 1943, another $200 was allegedly charged to his account, and Eulette signed a contract, referred to hereinafter as contract "C" to purchase this property from plaintiff through his agent, Elmore, for $2,000. In this contract Eulette's home address was designated rather than his business address which is identical to that of Elmore, since they had officed together for many years, and were close business associates.

It is not clear from the conflicting evidence just how, or whether this $300 deposit on contract "C" was paid by Eulette. The record stipulates that no cash was paid by Eulette to Elmore; there is no evidence that Elmore owed Eulette any sums; and it is admitted elsewhere in the record that the $300 was never charged to Eulette, but was advanced by Elmore.

In brief, on April 20, 1943, a three-cornered deal was entered, allegedly to accommodate Engbrecht, whereby Engbrecht assigned his interest in his original contract 1074 to Eulette; Eulette, in turn, signed contract "C" to purchase a tract of land from plaintiff for $2,000, and agreed the same day to give up this interest to Elmore so that he could sell the property to Engbrecht. The latter agreed under contract "B" to purchase this same tract directly from Elmore for $2,750, or $750 more than the amount to be paid by defendant Eulette to plaintiff. To complete this transaction defendant Eulette subsequently gave Elmore a deed to the property under contract "C" and also assigned to Elmore, on a separate paper, his interest in contract 1074.

Defendant Elmore insists that he apprised plaintiff of the details of the transaction in a telephone con-

versation with a Mr. Read, one of plaintiff's agents. Elmore claims further that inasmuch as Read refused to permit Engbrecht to trade contract 1074, on which he was already in default, for the more expensive tract, Elmore devised the plan of selling the property to Engbrecht directly, and maintains that this arrangement was sanctioned by plaintiff's agent.

The only evidence of this disclosure and consent is Elmore's own testimony. This is contradicted by Read and other agents of the plaintiff, who claim that no such conversation took place, but that, on the contrary, neither plaintiff nor his agents had any knowledge of Engbrecht's interest in the subdivision until it was accidentally brought to their attention in a casual conversation at a meeting of the board of directors of the Biltmore Country Club. Moreover, plaintiff's denial of Elmore's alleged full disclosure of the transaction is corroborated by the conduct of defendant Elmore.

Great caution appears to have been taken to sustain the illusion that Eulette was the bona fide purchaser of the property under contract "C," and the assignee of contract 1074. Elmore's monthly reports to plaintiff show payments made by Eulette on contract 1074, on which Elmore took commissions, notwithstanding the fact that Eulette had already assigned his interest therein to Elmore, who actually made the payments thereon. The reports likewise show payments by Eulette on contract "C" on which Elmore also took commissions, despite the fact that Eulette had given up his interest therein the same day he signed it, and the further fact that Elmore had contracted to sell the property to Engbrecht for $750 more than Eulette was paying to plaintiff. Furthermore, at the time Elmore submitted the unexecuted deed to plaintiff to convey the property under contract "C" to Eulette, Elmore already had in his possession a secret deed from Eulette to himself.

Further evidence that no proper disclosure was made is the fact that when Read inadvertently learned of Engbrecht's purchase from Elmore and requested full details, Elmore, in a delayed reply, merely reiterated his request for the immediate issuance of a deed to Eulette, and filed contract ''C'' with the recorder of deeds. If Elmore had made full disclosure, as he asserts, it is not clear just why he withheld these details when they were specifically requested. If the transaction were an honest one why was Eulette's suit against plaintiff for specific performance of contract ''C'' immediately dismissed by the defendant after the contract between Elmore and Engbrecht had been cancelled and Elmore was no longer under pressure to deliver a deed to Engbrecht?

Confronted with these facts and circumstances, defendant Elmore argues that even if plaintiff had not been fully apprised of the transaction originally, by consenting to the assignment of contract 1074, from Engbrecht to Eulette, and by accepting payments thereon, allegedly from Eulette, plaintiff ratified defendant Elmore's conduct and cannot be permitted to reject the remainder of the transaction.

■ ■ This shift in argument is not only tantamount to an admission of fraud, but is without legal merit. Consent to the assignment of contract 1074 was given by plaintiff prior to any knowledge of the three-cornered transaction. When plaintiff did discover the facts, he could not repudiate the assignment without prejudicing the rights of innocent parties, the Engbrechts, who had guaranteed Eulette's performance as consideration for the assignment.

■ ■ Furthermore, the assignment of contract 1074 by Engbrecht to Eulette was a separate legal act entirely independent of the execution of contract ''C,'' between Eulette and plaintiff, since each contract involved distinct and individually priced tracts of land purchased and sold by different parties. In fact,

according to defendant Elmore's original theory, contract "C" was contemplated and entered prior to the assignment of contract 1074. Therefore, even if defendant Elmore were permitted to assert the ratification of his own fraud as a defense, under the established rule that where a contract is severable a party may exercise a right to rescind for fraud as to part of the contract, and is not required to rescind the contract *in toto,* plaintiff could properly accept the assignment of contract 1074, and still reject contract "C." (46 Am. Jur., Sales, sec. 774; 24 R. C. L., Sales, sec. 649.)

This defense of ratification should be lightly considered on the further ground that defendants knowingly and deliberately continued to make payments under contract 1074 long after plaintiff unequivocally repudiated contract "C." If they regarded the transaction as a unit, they should have asserted this claim when plaintiff repudiated contract "C" and refused at that time to make payments under contract 1074.

From the foregoing facts and circumstances the chancellor concluded that Elmore, as plaintiff's agent for the sale of certain properties, did not make full disclosure to his principal of the transaction whereby he indirectly became the purchaser of his principal's property, and sought to make secret profit by contracting to sell it at a higher price than that paid to his principal.

These findings cannot be disturbed unless they are clearly against the preponderance of the evidence (*Arliskas v. Arliskas,* 343 Ill. 112, 115), and it is the opinion of this court that the record amply supports the conclusions of the chancellor.

On the basis if these findings, it is clear that contract "C" was voidable by plaintiff for fraud under the principles of law obtaining in Illinois since the early case of *Pensonneau v. Bleakley,* 14 Ill. 15, where the court stated:

"The law will not allow a party to be both buyer and seller of the estate of another, which has been confided to his discretion and disposal. . . . No matter how open and public and apparently fair the sale may be,—no matter how adequate and abundant may be the consideration,—sound morality and the policy of the law forbid it altogether, and the courts cannot sanction it."

The order of the circuit court, therefore, declaring null and void contract "C" dated April 20, 1943, between plaintiff and Eulette, as a cloud upon plaintiff's title, was proper and in accordance with law, and should be affirmed.

*Judgment affirmed.*