**LEES v. AKSHUN MFG. CO. et al.**

No. 10796.

United States Court of Appeals
Seventh Circuit.

June 26, 1953.

Rehearing Denied Aug. 25, 1953.

Warren C. Horton, Howard H. Rogers, Jr., Chicago, Ill., for appellant.

Will Freeman, George E. Frost, Norman Lettvin, Chicago, Ill., for appellees.

Before DUFFY and LINDLEY, Circuit Judges, and BRIGGLE, District Judge.

LINDLEY, Circuit Judge.

Plaintiff appeals from a judgment dismissing his complaint in equity seeking rescission of certain agreements with defendant, Akshun Manufacturing Company, and reassignment of several patent applications, both domestic and foreign, relating to ice making machines, designed by plaintiff and assigned to Akshun pursuant to the terms of the challenged agreements. Jurisdiction rests on diversity of citizenship, plaintiff being a resident of the State of Washing-

ton and defendants a resident of Illinois and two Illinois corporations.

■ The bases of the alleged right to rescind, as we read the complaint, are two: (1) plaintiff was fraudulently induced, by material misrepresentations of defendant Albright and others, to enter into the agreements; (2) defendant Akshun has committed a material breach of the contracts. A review of the record leads us to conclude that the first point was properly decided against plaintiff, that is to say, the findings of fact that no misrepresentation was practiced by defendant are supported by substantial evidence on the record considered as a whole. Consequently, under Rule 52 (a) of the Federal Rules of Civil Procedure, 28 U.S.C.A., we are bound by them. However, we find no findings with respect to the averments of material breach of the contracts. We find it necessary, therefore, to set aside the judgment and remand the cause for further proceedings in accord with the principles hereinafter set forth.

Plaintiff is an engineer who has, for several years, devoted his efforts to the design of a flake ice making machine. In the summer of 1950 he was residing in Seattle, Washington, where he had achieved relative success in the design and construction of a machine for one Branchflower. At that time he was approached by defendant Albright, who proposed that he come to Chicago and design machines for manufacture by the Albright Company. Plaintiff asserted at trial, and maintains here, that it was at this stage of the negotiations that defendants first practiced deceit by falsely representing to him that they possessed a large number of "orders" which awaited his talents and that they had at their disposal more than ample manufacturing facilities for large scale production. But defendants' contradictory evidence adequately supports the trial court's finding to the contrary.

We need not recite in detail other aspects of these Seattle meetings. At their conclusion on July 15, 1950, plaintiff and Albright executed a memorandum which provided that plaintiff would leave Seattle, in the company and at the expense of Albright, and proceed to Minneapolis, Minnesota, where "conferences" would be held with one Hansen "relative to the development and manufacturing of a new type ice machine. * * * We will endeavor to work out an agreement which shall have the following minimum provisions * * *. Jerry Lees is to draw a salary of $100 per week * * * plus 5% of the net profits before taxes, from the sale of ice machines made by this corporation, until $10,000 has been paid. * * * [S]ubject to the approval of the directors of any corporation that might be formed * * * you (E. J. Albright) will arrange the financing of any patents that G. M. Lees may be able to develop on the following basis—I [presumably plaintiff] agree to assign one-half interest in these patents as you [presumably Albright] direct. I will assign the other half as directed for a royalty which will amount to ½ of 1% of the profit before taxes of sale or rental of devices incorporating the patent applied."

■ Plaintiff maintains that this constituted the initial contract between the parties. His insistence is not without some reason, for he points out that although subsequent agreements imposed the same or greater burdens upon him, his corresponding benefits were materially less. Thus, he urges that the subsequent contracts, which, we shall see, were held determinative by the District Court, were not supported by adequate consideration. But we need not consider the merits of this argument, for it is perfectly obvious that this instrument in no way purports to be a contract. Indeed, by its very terms—"will endeavor to work out an agreement"—it contemplates nothing more than a possible future agreement.

The conference in Minneapolis did not materialize. However, on July 22, 1950, a meeting was held in Chicago attended by plaintiff, Albright, Hansen and W. J. Wiley, Eugene Jack and J. S. Neville. At that time another instrument was executed, which stated that it was "an agreement between G. M. Lees and * * *: Cristen Hansen, Eugene Jack and W. J. Wiley, who shall be hereafter referred to as the principals." By this agreement plaintiff contracted "to enter the employ of the principals to design and supervise construc-

tion of a new type ice-making machine in several sizes, * * * of the same general type as the one machine designed * * * for the use of the Lyle Branchflower Co. * * *, certain features of the machines to be designed will be patentable and G. M. Lees will apply for, assist in the prosecution and assign to the principals the patents involved. In return G. M. Lees will receive a salary of $100.00 per week, * * * plus 5% of the net profits up to and including $10,000.00, accruing to the principals from the sale or rental or other exploitation of these machines manufactured by or at the instance of the principals.

"It is understood and agreed that the principals will commit whatever legal entity they may form for engaging in the manufacturing of ice makers to the terms of this agreement." The agreement, save plaintiff's salary, was made conditional on the salability of the first machine produced. The profit sharing provisions of the agreement were to extend 99 years but, as to the salary provision, only for the period "reasonably necessary to perform his [plaintiff's] duties."

During the next month plaintiff had the opportunity to inspect the manufacturing facilities available to defendants. There is some evidence that he was dissatisfied and disappointed with them. Nevertheless, on August 18, 1950, he executed another agreement, this time with the newly created Akshun Manufacturing Company, the "legal entity" contemplated in the agreement of July 22, 1950. This agreement plaintiff characterized, at the time of its execution, as, "very satisfactory to me." It provided, following certain introductory and explanatory clauses, that,

"1. The Akshun Manufacturing Company * * * hereby does employ G. M. Lees * * * to design and supervise the construction and manufacture of the new type ice making machine * * * of the same general type and design by him devised for the use of the Lyle Branchflower Company * * *, at a salary of $100.00 per week, * * * and in addition thereto, the Akshun Manufacturing Company is to pay the same G. M. Lees 5% to the net

profits up to and including, but not in excess of the sum of $10,000 realized by the Akshun Manufacturing Company from the sale, rental, or other exploitation of said ice making machine * * *.

&ast; &ast; &ast; &ast; &ast; &ast;

"3. That the said G. M. Lees shall assign to the Akshun Manufacturing Company without further payment or consideration, therefor, all patent applications heretofore by him made and all letters patent, granted him by the United States Government pertaining to the ice making machine units referred to in this contract."

Other terms provided that the profit participation by plaintiff was conditioned on the marketability of the first machine produced; plaintiff would cooperate with Akshun; he would not render like services elsewhere during the term of the contract; he would apply for and assist in the prosecution of applications for patents on all features of the machines deemed patentable; the contract would extend for a period of one year, subject to renewal by mutual consent; plaintiff consented to the assignment by Akshun of the defined rights.

Pursuant to the terms of this agreement, plaintiff assigned to Akshun applications for two domestic and one Canadian patent. Thus, he fully performed, so far as was then possible, that portion of the contract. He continued in the employ of Akshun, devoting his time to design and supervision of construction of ice making machines. But progress was slow and plaintiff became dissatisfied with the prospects for the future. Friction developed between him and defendants, with the result that in February 1951, he consulted an attorney with respect to his rights under the then existing agreement. A letter was sent to Akshun which, among other things, asserted that under the "original contract" (i.e., the memorandum executed July 15, 1950) plaintiff was to assign only one-half interest in any patents resulting from his efforts. It then suggested the execution of a new agreement which would set forth the rights of the parties "in a manner which will leave no doubt as to what they are." Certain financial modifications were proposed; the one-year duration

of the August 18, 1950 contract with Akshun was questioned; a request was made to protect plaintiff in case of assignment by Akshun; an increase in plaintiff's salary was suggested. The letter closed by stating that plaintiff felt unless Akshun recognized his grievances he would be forced to return to Seattle.

On March 21, 1951, as a result of this letter, plaintiff executed his final agreement with Akshun. At the time two machines were in the process of manufacture. Plaintiff covenanted to supervise their completion within sixty days, and, failing to do so, he was to be released from the employment by Akshun. The $10,000 profit participation plan was extended for the life of the patents. The agreement then provided:

"6. As an added inducement to G. M. Lees to fully cooperate with the Akshun Manufacturing Company, the Akshun Manufacturing Company, after its collection on the sale of Thirty Thousand and no/100 ($30,000.00) Dollars worth of ice making machines, agrees to pay G. M. Lees, which payment is to apply against the said $10,-000.00 net profit participation; one (1) per cent of the net sales realized from said ice making machine or the five (5) per cent of its net profits whichever shall be the largest. Profit participation payments to be made every three (3) months beginning thirty (30) days after the volume of Thirty Thousand and no/100 ($30,000.00) Dollars has been reached.

"7. If the profit participation of $10,-000.00 is not paid in full within five (5) years of this date, the Akshun Manufacturing Company will grant to G. M. Lees a nonassignable license to manufacture ice making machines under the Lees patents subject to a minimum royalty of one (1) per cent of the net received from the sale of the ice machines payable to the Akshun Manufacturing Campany."

In addition this contract provided that all assignments by Akshun would be subject to plaintiff's rights, and, in the event of the failure of Akshun so to protect plaintiff, he would be entitled to reacquire the patents upon payment to Akshun of the costs incurred in prosecuting them. The provisions of the agreement of August 18, 1950, insofar as they were not inconsistent with this contract, were extended for the life of the patents. The document concluded: "The acceptance of this letter [contract] by G. M. Lees fully adjusts and settles all controversies existing between him and the Akshun Manufacturing Company."

Plaintiff continued in the employ of Akshun until September 26, 1951, at which time he notified defendant that he was severing his connections with it. He stated as his reason that the agreement of August 18, 1950 had not been fulfilled by Akshun. A demand was made for the reassignment of the patent applications previously transferred to Akshun. During the period following the agreement of March 21, 1951 and prior to his resignation plaintiff had supervised the successful construction of the two machines in process at the time of his final agreement.

As stated previously, the District Court's determination that the several agreements were not tainted by misrepresentation is, in this situation, conclusive upon us. Even if we were persuaded that material misrepresentations had been made to plaintiff in Seattle, thus vitiating whatever the effect of the document there executed, we would be unquestionably overreaching our bounds to conclude similarly with respect to the agreements of August 18, 1950 and March 21, 1951. Clearly by the latter date plaintiff was well aware of any misconduct on the part of defendant. Nevertheless, he, at that time, ratified the agreement of August 18, 1950, accepted an alteration in the financial arrangement, and adjusted and settled "all controversies existing between him and the Akshun Manufacturing Company." Plaintiff is not a child; he is a well educated man. He was represented by counsel prior to this final agreement. Under such circumstance, we feel that we are not justified in holding that this final contract was rendered void by misrepresentation or overreaching on the part of defendant.

The District Court concluded that the "entire understanding between the parties * * * are set forth in the agreement of August 18, 1950, * * * as modified by the agreement of March 21, 1951 * * * [and these agreements] are good and valid

in law." Was this conclusion erroneous? We have previously noted that the document of July 15, 1950 does not purport to be a contract. Thus, we need consider it no further. Plaintiff asserts, however, that the agreement of July 22, 1950, executed by him and Hansen and Wiley, has a material effect on the lower court's conclusion. It differs in terms from the documents relied upon by the court in that it fixes the duration of the agreement as 99 years. Subsequent agreements were limited first to one year,—later modified to the life of the patents. Thus, plaintiff appears to argue that defendant was under a preexisting duty to extend the enumerated benefits to him for a longer period than that prescribed in the later agreements. Consequently it is urged that the later agreements are not supported by adequate consideration.

We encounter difficulty in agreeing with plaintiff's rationale for two reasons: (1) The parties to the agreement of July 22, 1950 are not defendants in this law suit and no showing is made whereby defendant Akshun can be held accountable for their contracts. We are not told whether plaintiff regards the signers of the July 22, 1950 agreement as agents of the then non-existent Akshun, or perhaps its promoters. (2) But, more important is the fact that duration was one of the grievances voiced by plaintiff in his letter to Akshun of February 15, 1951. He considered it a controversy as of that time, which was, along with "all controversies", adjusted and settled by the agreement of March 21, 1951. Thus, whatever the effect of the July 22, 1950 agreement on the period of time that Akshun was obliged to extend the profit sharing benefits to plaintiff, that question was resolved by the memorandum of March 21, 1951 which, in essence, rescinded all prior agreements, and redefined the relationship of the parties, relying upon the prior agreement of August 18, 1950 for certain terms of that relationship.

In a final effort to avoid the terms of the March 21, 1951 agreement, plaintiff asserts that it was executed by Albright as vice-president of Akshun and, relying on Sellers v. Greer, 172 Ill. 549, 50 N.E. 246, 40 L.R.A. 589, contends that Akshun was not bound thereby because Albright had not been duly authorized so to represent the corporation. However, at the time of the agreement the designated president of Akshun had resigned. Thus, Albright was, by the very nature of his office, its superior officer; its acting president. Consequently he was authorized to execute this agreement on behalf of his corporation. Bloom v. Nathan Vehon Co., 341 Ill. 200, 173 N.E. 270, 72 A.L.R. 232; Fletcher, Cyclopedia of Corporations, Sec. 560.

In short, then, we conclude that the District Court's conclusion that the agreements of August 18, 1950 and March 21, 1951 defined the rights of the parties and were valid in law was eminently sound. And so we come to a consideration of the rights and duties created thereby.

Plaintiff was to work as a designer and construction supervisor for Akshun; he was to cooperate and aid in the prosecution of any patent applications filed with respect to the machines he designed; he was to assign, *in toto*, all of his rights in such applications and patents issued thereunder, past and present, to Akshun Manufacturing Company. In return Akshun covenanted to pay him a salary of $100 per week and in addition thereto pay him a portion of the profits realized from any exploitation of the machines (*i. e.*, by sale or rental). This profit participation was to be computed in the following manner: upon the realization of $30,000 in sales, plaintiff was to be paid either 1% of the net sales or 5% of the net profits, whichever sum was the larger. The profit percentage was to be computed on the basis of both sales and rentals; the sales percentage solely on the basis of net sales. Such payments were to be made every three months, beginning 30 days after the realization of the $30,000 sales figure. The payments were to extend for the life of the patent or until the sum of $10,000 was paid plaintiff, provided, however, that in event the sum of $10,000 was not paid within five years Akshun would grant plaintiff a non-assignable license to manufacture the machines in his own right subject to a one percent royalty payment to Akshun.

Plaintiff has yet to receive a profit sharing payment. By paragraph twenty-one of

his amended complaint he alleged "that the said E. J. Albright, and one or both of the corporate defendants, have from time to time entered into contracts or agreements between themselves and with others, granting licenses and exclusive territorial or special field licenses, and rights to manufacture, use, and sell processes, machines and units invented by plaintiff * * * and have arranged with such other companies and among themselves for the manufacture, sale and rental of such machines under conditions that little if any profit can ever be shown to have been made by the Akshun Manufacturing Company, thereby preventing plaintiff from realizing or receiving any portion of the $10,000.00 sum promised him * * *." Paragraph twenty-two alleged sales of the machines by "one or some of the defendants" "far in excess of the actual cost of manufacture thereof" and that defendants "have failed to inform plaintiff of such sales or to account to him for the moneys received thereunder."

Plaintiff's evidence tended to show that Akshun manufactures the machines and sells them to the Albright Company. They are in turn distributed by the Arctic Company, which has been given an exclusive distributorship by the Albright Company. At the time of the trial Akshun had sold four machines to the Albright Company at a total price of $26,673.75. E. J. Albright testified that while the sales of Akshun had not exceeded $30,000, the sales of Akshun plus the sales of Albright Company did exceed $30,000. He further testified that Akshun had never shown a profit. However, as we have seen, under the supplemental agreement of March 21, 1951 profit participation was not totally dependent on a realization of profit by Akshun.

■ The findings of fact and conclusions of law entered by the District Court fail to reflect any consideration of plaintiff's allegations 21 and 22 and the above described evidence material thereto. The judgment entered recites that the agreements have "not been breached." However, we are supplied with no guide as to the basis for this ultimate conclusion. The issue was an extremely crucial one upon which we should have the benefit of the mature judicial deliberation of the court.

At the outset, we observed that plaintiff sought, by his complaint, to rescind the agreements and have restored to him his interests in the patents and applications therefor which he had assigned to Akshun. One alleged basis for this relief, as we have seen, was the averred breach by defendant Akshun of those portions of the agreements pertaining to profit sharing. Certainly those were material undertakings on the part of Akshun. The proof showed that plaintiff had been employed in Seattle at a wage substantially equal to that paid him by Akshun. Certainly the promise of profit sharing was a major inducement to persuade plaintiff to execute the patent assignments.

One inference which can possibly be drawn from the proof adduced is, that the defendants have, by means of a labyrinth of corporations, so arranged their financial books as to show sales less than $30,000 and no profit. Such a scheme would be in total dereliction of their duties and would constitute a breach of their obligations as much as had they expressly repudiated them. Inasmuch as the undertaking was one material to the contract, such conduct would constitute a material breach thereof.

■ The Illinois authorities, which, in this case are controlling, teach us that an action for rescission may, under certain circumstances, properly be brought by one party to a contract when a material breach has been committed by the other party. Forest Preserve Real Estate Improvement Corp. v. Miller, 379 Ill. 375, 381, 41 N.E.2d 526; Sampson v. Marra, 343 Ill.App. 245, 98 N.E.2d 523. In such a case the plaintiff is entitled to have returned to him properties conveyed to the defendant prior to the breach, Wall v. Chicago Park Dist., 378 Ill. 81, 37 N.E.2d 752; Therm-O-Proof Insulation Mfg. Co. v. Hoffman, 329 Ill.App. 645, 69 N.E.2d 725, with the result that plaintiff is restored to his prior position.

■ However, it is the reciprocal duty of the rescinding plaintiff to restore the defendant to his previous position, for "a

party to a contract cannot retain the consideration or a part of it, and refuse to be bound by the contract or a part of it. * * The inability of the party to restore the consideration will not relieve him from the necessity of doing so, and it is not sufficient to offer to set off the amount [received] * * *. The right of rescission * * * can be exercised only upon a return of the consideration, which must be alleged in the bill." Babcock v. Farwell, 245 Ill. 14, 39, 91 N.E. 683, 692. See also, Vance v. Chicago Portrait Co., 7 Cir., 19 F.2d 981; Metropolitan Life Ins. Co. v. Whitestone Management Co., 7 Cir., 77 F.2d 255. Though an exception to this rule has been noted in cases involving rescission of parts of a severable contract, Olson v. Eulette, 332 Ill. App. 178, 74 N.E.2d 609, it is clear that the instant agreements were not of that nature. Williston on Contracts, Sec. 860A; Restatement, Contracts, p. 266 et seq.

Plaintiff made no offer to return any portion of the $100 per week salary paid him by defendant, Akshun. This failure may well preclude his obtaining the relief he seeks. However, it is also possible that the reasonable value of the services he rendered defendant, Akshun, exclusive of the patent assignments, was equal to the salary paid him. In such a case he would owe defendant nothing and the tender would be a useless act. This question of value is, of course, one of fact for the trial court.

In conclusion, then, it is ordered that the judgment of dismissal be set aside and the cause remanded for further proceedings in the District Court, at which time a determination will be made with respect to the value of the designing and supervisory services rendered by plaintiff. If it is concluded that such value is equal to or in excess of the $100 per week paid plaintiff, the court will then proceed to consider the question of breach in accord with the views expressed herein. Finally, we note that the judgment on defendants' counterclaim, based on a promissory note executed by plaintiff in favor of the Akshun Manufacturing Company, is erroneous insofar as it grants recovery in favor of E. J. Albright and the Albright Company. In that respect the judgment is reversed.