Edna Kettle, Adm'r de bonis non with will annexed, of the Estate of Fred Rembka, Deceased, substituted for Fred Rembka and Rose Rembka, Deceased, Plaintiff-Appellant, v. Meyer Katz and Philip H. Cohn, Sr., Defendants-Appellees.

Term No. 56–M–6.

Fourth District.

October 31, 1956.

Released for publication February 4, 1957.

James O. Monroe, Jr., and Joseph R. Bartylak, both of Collinsville, for plaintiff-appellant.

Listeman and Bandy of East St. Louis, for Philip H. Cohn, Sr., defendant-appellee.

PRESIDING JUSTICE SCHEINEMAN delivered the opinion of the court.

This appeal arises out of a suit for an accounting against two real estate brokers for money alleged to be due on the sale of a house owned by Fred Rembka. The latter is now deceased and Edna Kettle, Administrator de bonis non with will annexed, has been substituted as plaintiff. The cause was referred to a Special Master, whose report found in favor of plaintiffs and concluded that defendants should pay to plaintiffs the sum of $3,287.90 with costs.

Objections by each of the defendants were overruled and allowed to stand as exceptions. The court thereafter sustained the exceptions of defendant Philip H. Cohn and dismissed the suit as to him for want of equity; defendant Katz was ordered to pay the sum of $675 with interest and costs.

On this appeal plaintiffs contend that Cohn was an agent for them by his own acts, or at least a sub-agent of Katz; that Cohn stood in a fiduciary capacity and used his position to obtain unjust enrichment for himself; and that Cohn and Katz had falsely represented to plaintiffs that a foreclosure suit was about to be filed. Defendant Katz did not perfect an appeal, but Cohn has filed a brief contending that the evidence shows he was not an agent in any sense, but was a purchaser from plaintiffs.

The decree appealed from states that certain specified findings by the master are not supported by any evidence or are contrary to the manifest weight of the evidence. From our examination of the testimony we find that there is substantial evidence to support the essential findings in the master's report.

The facts are that plaintiffs had become concerned over their financial condition, and had decided to sell

their home. In August of 1951, they listed the house with Katz at 5% broker's commission. It was eventually sold to Mr. Cashens for $7000. There was an installment mortgage on the house for the original sum of $1000 on which some payments had been made, and some were past due.

Plaintiff, Fred Rembka, had suffered a stroke and had been in a hospital for some time. The hospital bill had been placed in judgment, being approximately $475; there were unpaid taxes of $87 and the delinquent installments on the mortgage were about $125. But the Rembkas owed other bills, aggregating about $527, which were not liens. This was the financial condition which had them worried, but it is not clear that Katz was fully aware of all this when the property was first listed.

Katz soon found a buyer for the property, a Mr. Cashens, who signed a contract to purchase for $7500 and paid $1000 down, the cash being paid to Katz. Katz took his customer to a title company where the liens were disclosed. It is, of course, obvious that the down payment was more than adequate to pay off the judgment and tax liens, and to pay the past due installments on the mortgage. However, Katz did nothing more about it for a couple of months. Rembkas received another delinquency notice from the mortgagee, and Cashens was becoming impatient, asking for the return of his money if the deal could not be closed.

Finally, Katz telephoned to Cohn and told him of the situation, also arranging for a call at Cohn's real estate office with the Rembkas. According to the testimony of Mrs. Rembka, Katz said they were going to see Cohn to keep the mortgage holder from "closing in on them," and that this was the discussion at Cohn's office. She understood that Cohn was going to assist in financing the sale, that he would pay them $1000, pay all of the bills and then remit whatever was left to

269

them. Cohn asserts that he only agreed to buy the Cashen contract for $1000 and payment of all bills of the Rembkas, the excess to be retained by him. This conversation occurred early in November.

Other circumstances and testimony tend to corroborate the testimony of Mrs. Rembka. It is apparent that there must have been some talk of foreclosure, for Katz testified that at one time he had been shown a letter threatening foreclosure.

Mr. Cashen testified that Cohn talked to him and his wife about completing their contract. At first he asked for his money back, but Cohn said Cashens had to look to Katz for that. Later he made a proposition of reduced price. Cashen asked Cohn how much Rembkas would get out of it, and Cohn replied about $1650. Mrs. Cashens said that was not enough and they left. Later they were persuaded by Cohn to go through with the deal at a price of $7000 and they would be credited with the $1000 paid down. In December the deal was completed on that basis.

During these negotiations, it is apparent that Cohn regarded himself as an agent or broker for Rembkas. He kept a book account in which he charged them with title examination, and with his personal traveling expense in seeing the Cashens, which a purchaser would have had no right to do.

In the final closing, Cashens gave a mortgage to Sparta Building and Loan Association for $4600, the net proceeds of which, $4507.90, was paid to Cohn, and they gave Cohn a second mortgage for $1400. Cohn paid off the old mortgage for $968.79, the taxes of $87.65, and the judgment of $493.30. He also paid off the open accounts of the Rembkas, and the various expenses, including his personal disbursements. The grand total came to $2270. He then tendered $1000 to Rembkas and demanded that they sign an agreement reciting that this was according to their previous

270

arrangement. Mrs. Rembka says she was so shocked she could not talk. The title officer who was present with Cohn and the Rembkas, testified that Cohn said to the Rembkas "If they had any other suggestions to make of any kind he would be glad to walk away from the transaction and have no part of it." This witness had heard the talk about the possibility of foreclosure, and observed that, in signing this final document, the Rembkas thought they had to take it or they would lose their property and get nothing.

One of the master's findings which the court held unsupported was, in substance, that the Rembkas' fears of foreclosure were unfounded, there had been no threats or intention to foreclose. Katz had claimed he had seen a letter threatening foreclosure, and there was testimony that a man named Banks, formerly with the loan company, and now deceased, had talked of such action. On the contrary, the Rembkas produced the letters received from the loan company, and they were simply notices that installments were past due, requesting payment, but saying nothing about foreclosure.

The president of this loan company testified that he was the only one with authority concerning foreclosures, that he had not authorized such action, it had never been discussed by the company's officers, nor any attorney consulted, and that they were never concerned about this loan.

We are unable to see any reason for a loan company to be concerned about a loan that had been reduced to less than the $1000 face value, on a property which another company regarded as security for a loan of $4600. In our opinion the weight of the evidence supports the finding of the master.

■ As a final result, for negotiating this sale from Rembkas to Cashens, after all disbursements are duly credited, and after Cohn paid $1000 to Rembkas, Cohn

retains $1237.90 cash, plus a second mortgage for $1400 and Katz retains $1000. Thus the defendants retain a total of $3637.90 out of a sale price of $7000. They have performed only the ordinary routine services of real estate brokers, for which the regular commission would be $350. In our opinion the record here discloses that the large sum retained by defendants is unjust enrichment obtained by playing upon the fears and worries of unfortunate people.

It is not the policy of the courts to condone subterfuges and ingenious methods sometimes used by real estate brokers to acquire some interest in a client's assets by taking on the appearance that they are acting as a purchaser. Many such attempts have been set aside by the courts. Stemm v. Gavin, 255 Ill. 480; Lerk v. McCabe, 349 Ill. 348; Johnson v. Bernard, 323 Ill. 527; Hyman v. Burmeister, 216 Ill. App. 98; Olson v. Eulette, 332 Ill. App. 178.

As a so-called purchaser, Cohn advanced no money of his own and took no risk. Early in the transaction he had the Rembkas deed the house to himself, for which he paid nothing whatever, he was simply acting as a "straw man." Thereafter he performed the routine services of a broker, closing the sale with the purchaser that Katz had produced, and disbursing the proceeds. Out of the net balance of $4637 which remained after all liens and other bills were paid, Rembkas received only $1000.

"A person who has been unjustly enriched at the expense of another is required to make restitution." Restatement on "Restitution" Section 1. The defendant Cohn should be required to make restitution by paying to plaintiff's administrator the $1237.90 cash that he retained, plus any payments he has since collected on the second mortgage, and to assign the second mortgage and note (without recourse) to the administrator. In lieu of such assignment, the balance due thereon may be paid in cash.

The trial court has allowed Katz a commission of $375 and given judgment against him for $625 which is the balance of the $1000 he had received. That part of the decree is not involved in this appeal. The remainder of the decree is reversed and the cause remanded with directions to enter a decree against defendant Cohn in accordance herewith.

Reversed and remanded.

BARDENS and CULBERTSON, JJ., concur.